**BRISTOL TECHNOLOGY, INC., Plaintiff,**

v.

**MICROSOFT CORPORATION, Defendant.**

**No. CIV. A. 3:98–CV–1657.**

United States District Court, D. Connecticut.

Aug. 31, 2000.

Patrick Lynch, O'Melveny & Myers, Los Angeles, CA, John L. Altieri, Jr., Annette Poblete, Achilles M. Perry, O'Melveny & Myers, New York, NY, Mladen D. Kresic, Kresic & Corleto, Ridgefield, Anthony L. Clapes, Technology Law Network, Honolulu, HI, for Bristol Tech, Inc, plaintiffs.

David B. Tulchin, Michael T. Tomaino, Jr., Marc De Leeuw, Elizabeth P. Martin, Brian T. Frawley, John J. Sullivan, Sullivan & Cromwell, New York, NY, James Sicilian, Day, Berry & Howard, Hartford, Steven J. Aeschbacher, Microsoft Corporation, Redmond, WA, Steven W. Thomas, Sullivan & Cromwell, Los Angeles, CA, for Microsoft Corp., defendants.

**RULING ON BRISTOL TECHNOLO-GY'S MOTION FOR AWARD OF PUNITIVE DAMAGES [DKT. NO. 433] & MOTION FOR PERMANENT INJUNCTION [DKT. NO. 431]**

HALL, District Judge.

Bristol Technology, Inc. ("Bristol") commenced this action against Microsoft Corp. ("Microsoft") on August 18, 1998. Its fourteen-count complaint alleged federal and state antitrust claims and other state statutory and common law claims, including violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. § 42–110a et seq. Bristol also filed a Motion for Preliminary Injunction. After several scheduling conferences and issuance of a preliminary discovery schedule, the court held a four-day evidentiary hearing on that motion in October 1998. In its memorandum of decision dated December 30, 1998, the court denied Bristol's Motion for Preliminary Injunction, but set the case down for trial in June 1999.

On July 16, 1999, after a six-week trial, the jury found Microsoft had committed a deceptive act or practice in violation of CUTPA.[1] The jury awarded Bristol one dollar in compensatory damages on this count. Bristol now seeks the entry of additional relief, in the form of punitive damages and a permanent injunction under CUTPA. For the following reasons, Bristol's motion for punitive damages is granted and its motion for injunctive relief is granted in part and denied in part.

## I. BACKGROUND

Microsoft is the owner and distributor of computer operating systems, including Windows, Windows 95, Windows 98, Windows for Workgroups, and Windows NT. A computer operating system controls the basic functions of the computer hardware. It also facilitates interaction between the hardware and application programs. Application programs, such as word processing and spread sheet programs, give the computer its functionality by providing the computer with instructions for the performance of a task. To run, an application program must be able to present commands and respond to the operating system in precisely the format and according to the precise protocols used by that operating system. Therefore, independent software vendors ("ISVs") must write their

---

1. The jury also found that Bristol had failed to prove the relevant market on each of its federal and state antitrust claims. In light of that finding, Bristol did not prevail on those claims. Further, the jury did not find any unfair acts or practices committed by Microsoft in violation of CUTPA.

application programs to be compatible with the operating system's application programming interfaces ("APIs"). Because different operating systems have different protocols and APIs, application programs written for one operating system usually must be rewritten to work on another operating system.[2]

Microsoft has developed operating systems for personal computers, technical workstations and departmental servers. A technical workstation ("workstation") is a microprocessor-based machine typically used for highly computational, technical applications. A departmental server ("server") is a microprocessor-based machine that is used to provide or manage common services and functions for other computers that are linked together in a small to medium-sized network.

Beginning in the 1980s with the development of MS/DOS,[3] Microsoft has produced operating systems that now comprise more than 90% of the personal computer operating system market. In 1993, Microsoft entered the departmental server and technical workstation operating systems markets with the introduction of Windows NT ("NT"). In each of those markets, Microsoft's share has grown dramatically. Microsoft's share of the market in new NT operating system units, including servers and workstations, grew from a fraction of 1% in 1993 to 4.2% in 1994, almost 20% in 1995, 28% in 1996, and up to almost 44% in 1997. On departmental servers alone, Microsoft's share of the market in new operating system units grew from almost 21% in 1995 to 29% in 1996 and to 45% in 1997.

Bristol was formed in 1991 by several members of the Blackwell family. Its business plan was to develop a cross-platform product which, when installed on a UNIX-based operating system,[4] would run application programs written for the Windows operating system.[5] Bristol eventually developed such a program, called "Wind/U," by reverse engineering the Windows operating systems to obtain the necessary source code.[6]

After it began marketing Wind/U, Bristol was contacted by Microsoft, which offered to help improve the product by providing Bristol with access to source code

---

**2.** Programs written in the Java language, developed and licensed by Sun Microsystems, are exceptions. Java is both a platform and an advanced programming language. The Java platform runs on top of an operating system such as Windows NT or UNIX. The Java platform is designed to allow ISVs to write application programs that will run on any operating system that supports the Java platform.

**3.** MS/DOS was the original operating system offered by Microsoft for IBM personal computers.

**4.** "UNIX" is a core of technology originally developed at AT & T Bell Laboratories. There are various versions of the UNIX system, as well as other, non-Windows operating systems such as Open VMS and IBM's OS/390, to which Bristol's products can translate Windows applications. For convenience, the court will use "UNIX" or "UNIX-based" to refer to all of these operating systems in the context of the use of Bristol's products.

**5.** Wind/U, Bristol's chief cross-platforming product, was offered in two ways. Bristol developed a software development kit

("SDK") for Windows software application developers. An SDK consists of special programs and documentation designed to enable a programmer to write application for a specific platform or group of platforms. Bristol's Wind/U SDK allows a particular Windows program to run on UNIX. Bristol also offers a Wind/U "runtime" product. A "runtime" is a computer file or set of files that run at the same time as an application and operating system. The Wind/U runtime product, when installed on a UNIX-based operating system, enables that system to run any Windows application.

**6.** "Source code" is the computer program as written by the programmer. It includes both logic, expressed in algebraic-like equations or human readable words, and "comments" which are human language text written to provide understandable descriptions of the intent of the program's logic. Because operating systems have different APIs, source code is needed to create an effective cross-platform product.

for the current and soon-to-be-released product versions of Windows operating systems. Microsoft and Bristol eventually entered into a contract, dated September 21, 1994 ("1994 WISE Agreement"), which contract was part of what Microsoft called the "WISE Program,"[7] a licensing program from Microsoft designed to enable ISVs to translate or run Windows applications on UNIX and Macintosh systems. The WISE Program had been announced by Microsoft earlier in 1994.

Microsoft began creating the program which it eventually called WISE at a time when makers of UNIX-based operating systems had sizeable shares of the server and workstation markets and Microsoft had nearly none.[8] Microsoft contracted with Bristol and others, including MainSoft Corporation, through the WISE Program in order to encourage ISVs to write cross-platform applications on Windows NT 3 ("NT 3").[9]

The 1994 WISE Agreement licensed source code of certain Microsoft operating systems to Bristol to use in developing its cross-platform product, which products are generally known as "Wind/U." The 1994 WISE Agreement expired on September 21, 1997, although, under the terms of the 1994 WISE Agreement, Bristol was entitled to continue using source code provided to it before that date, with the continuing obligation to pay royalties on the use of that code.

The scope of the 1994 WISE Agreement is a subject of dispute between the parties. This Agreement describes the source code licensed under it as including Windows 3.1 and Windows NT 3.5, and "any Version Releases and Update Releases" thereto during the three-year term of the 1994 WISE Agreement. 1994 WISE Agreement at ¶ 1(w)(iv). "Version release" and "update release" were defined in the contract as a change in the product designation number to the right of the decimal period, in the tenths and hundredths digits respectively. For example, a version release of Windows 3.1 would be designated as Windows 3.2, whereas an update release would then be designated as Windows 3.21. "Product releases" were defined in the Agreement as any Windows and NT products with a 3 to the left of the decimal point. *Id.* at ¶ 1(q). For example, if the current product release were designated as Windows 3.1, then a new product release would be designated as Windows 4.0. Thus, Microsoft argues that Windows NT 4 ("NT 4") was not covered by the 1994 Agreement. However, Bristol argues that it is covered because Microsoft made numerous representations to the effect that NT 4 would be licensed to Bristol.

Negotiations between Microsoft and Bristol on a new licensing agreement to replace the 1994 WISE Agreement when it expired on September 21, 1997 began at least as early as 1996. The negotiations were unsuccessful, and Bristol brought suit. Microsoft then signed a licensing agreement with Bristol's main competitor, MainSoft, on August 25, 1998 ("1998 MainSoft Agreement"). After Bristol failed to prevail on its antitrust claims in this action, Bristol signed the MainSoft version of the licensing agreement with Microsoft on August 2, 1999 ("1999 Agreement"). Both the 1998 MainSoft Agreement and Bristol's 1999 Agreement prohibit MainSoft and Bristol from revealing the terms and conditions of their new WISE agreements,

---

7. WISE is an acronym for *W*indows *I*nterface *S*ource *E*nvironment.

8. In 1993, shipments of new UNIX operating systems represented 23.6% of shipments in the server market and 94% in the workstation market. Comparable Microsoft figures were 0.7% and 0.1%.

9. Microsoft entered into a WISE Program contract with MainSoft on March 2, 1994 ("1994 MainSoft Agreement"). Mainsoft is Bristol's main competitor for Microsoft to UNIX cross-platform products. As part of the WISE Program, Microsoft also entered into contracts in 1994 with companies other than Mainsoft and Bristol, which companies made porting tools for operating systems other than UNIX.

including the fact that the agreements provide only a subset of the Windows NT 4 Workstation and NT 5 Workstation technologies in source code form. 1999 Agreement at ¶¶ 1(d), 2(a)-(g), 8(c), 19(a); 1998 MainSoft Agreement at ¶¶ 1(d), 2(a)-(g), 8(c), 19(a).

## II. MOTION FOR PUNITIVE DAMAGES

### A. Introduction

In the first motion, Bristol requests "entry of an award of punitive damages in an amount sufficient to punish Microsoft for its deceptive practices with respect to the WISE program and to deter similar conduct by Microsoft and others in the future." Bristol Technology's Motion for Award of Punitive Damages (Docket No. 433) at 1. Bristol claims that it is entitled to a substantial award of punitive damages based on Microsoft's recklessly or wantonly deceptive behavior in violation of CUTPA. Bristol argues the record demonstrates that Microsoft was reckless, at the very least, with regard to the accuracy of its representations regarding the WISE Program. *Id.* at 4.

Bristol claims that, regardless of whether Microsoft's representations concerning the openness of the Win 32 APIs were false when first made in 1994, they became deceptive in 1997 when Microsoft decided to exclude certain server technologies from the WISE Program. *Id.* at 5. Further, Bristol claims that Microsoft also did not modify or retract any of the statements about the openness of its APIs through the WISE Program that Microsoft continued

to proliferate through the WISE Program "White Paper" or Mission Statement ("PX 1"). Instead, Microsoft prohibited Bristol's competitor and fellow WISE contractor, MainSoft, from publicly disclosing the technology restrictions Microsoft had placed on the WISE contractors in the 1998 Mainsoft Agreement. *Id.* at 5–6. Bristol claims that Microsoft aggressively promoted WISE as an "open standard," a complete solution for Java and other rival technologies through, *inter alia,* publication of PX 1 on its website, up through the end of trial in July 1999. *Id.* at 6.

Bristol further asserts that Microsoft, with its dramatic market share growth and the significant increase in the number of applications for Windows NT, no longer believes it is necessary to provide a "bridge" back to UNIX for ISVs. Because the cross-platform tools developed by Bristol and Microsoft's other WISE Program partners rely on Windows source code, Microsoft is able to control what functions can be "ported," or translated, between the systems by limiting access to the relevant source code for new product releases of Windows operating systems.[10]

Microsoft argues that its relationship with Bristol is defined by its 1994 WISE Agreement, which contained integration and no-oral-modification clauses, thus militating against a finding of reckless, wanton, or wilful deception by Microsoft toward Bristol. Microsoft's Memo. in Opp. (Docket No. 435) at 10. However, the terms of the contract between Bristol and Microsoft are irrelevant to the court's

---

**10.** Bristol further argues that this court should consider the findings of fact and conclusions of law filed by Judge Jackson in *United States v. Microsoft,* 84 F.Supp.2d 9 (D.D.C.1999) and 87 F.Supp.2d 30 (D.D.C. 2000) in support of its claim for punitive damages under CUTPA. Bristol argues that these findings are "relevant to the public interest" and that there "is a direct connection between the practices found deceptive in this case and the conduct found predatory in *United States v. Microsoft.*" *See* Bristol Technology's Supplemental Memorandum in Support

of its Motion for an Award of Punitive Damages (Docket No. 456) at 1.

The court does not agree. The decision in the *U.S.* case does not concern the WISE Program, the use of PX 1 or related documents, or Microsoft's relationship with Bristol. Moreover, that court's findings address Microsoft's attempts to maintain its monopoly power in the PC market and leverage it into the Internet market rather than deceptive practices in markets other than the PC or Internet market.

analysis of whether Microsoft acted recklessly or wantonly in, as the jury found, engaging in a deceptive act or practice. Microsoft in essence argues that the contract released it from conduct in which it had not yet engaged. The court cannot agree. The court does agree with Microsoft's assertion that Bristol knew that it needed to negotiate a new contract to obtain new Microsoft source code after September 1997. *Id.* However, the court does not agree with Microsoft's assertion that Bristol knew prior to the expiration of its 1994 WISE Agreement in September 1997 that the terms of that agreement, which provides Bristol access to all source code of covered operating systems, would be substantially changed in a subsequent agreement.[11]

## B. Findings of Fact

The court presided over the preliminary injunction hearing and trial of Bristol's claims to the jury. The court has also reviewed in connection with the present motions the trial transcripts and exhibits, and now makes the following findings of fact for purposes of deciding Bristol's Motion for Punitive Damages. On the basis of the following findings of fact, the court finds that the deceptive conduct engaged in by Microsoft clearly rises to the level of reckless and wanton indifference to the harm it caused Bristol and others, including ISVs, that relied on Microsoft's assurances regarding the viability of products

under the WISE Program to allow porting of applications written for Microsoft's latest NT source code. As discussed below, the court will therefore exercise its discretion to award punitive damages under CUTPA.

### 1. Launching and promoting the WISE Program

In 1994, Microsoft launched the WISE Program to allow customers to integrate Windows-based solutions with UNIX and Macintosh systems. The technology developed in the WISE Program allowed application developers to write software to Windows APIs and run the resulting applications on Macintosh and UNIX systems. The technology would thereby enable developers to write to a standard set of APIs and then run the application across any Windows, UNIX, or Macintosh platform, hence the term "cross-platforming." *See generally* PX 1 at 2–3.[12]

Microsoft issued the WISE Program Mission Statement in January 1995. PX 1. Microsoft distributed this document through a number of channels, including its website and through the Microsoft Developers Network ("MSDN")[13] and Visual C++,[14] both of which are tools designed to enable ISVs and developers to more easily write applications for the Windows platform. In this document, Microsoft represented to interested developers and ISVs the benefits of the WISE Program to

---

**11.** The record does reflect a passing suggestion in mid-August of 1997 that the WISE Program might not continue at all. This, of course, did not become Microsoft's position, as Microsoft's negotiations with Bristol and MainSoft in 1997 and 1998 demonstrate.

**12.** PX 1 does not have page numbers. However, in view of the length of the document, the court will impose numbered pagination upon PX 1 for the purpose of citing to it.

**13.** The MSDN is a network of resources that Microsoft provides to developers to use to assist them in writing applications to run on the Windows platform. According to Microsoft, the MSDN is a comprehensive resource, "offer[ing] something to meet nearly every developer need, including the MSDN Online

membership, a free program that provides programming information and technical resources to nearly 700,000 developers" as of October 1998. PX 462. PX 1 was, at least through the time of the trial, available by searching the MSDN Online for information on the WISE Program.

**14.** Visual C++ is a Microsoft application development system for the programming language C++ that runs under MS–DOS and Windows. Visual C++ is a visual programming environment distributed by Microsoft. PX 1 was, at least as of the time of the trial, contained within the "Help" directory for the online help system of Visual C++.

allow them to write software that could run across various platforms. Corporate users of software written using WISE technology benefitted from requiring only one application that could run on the variety of platforms these users often employ within their computer systems. According to PX 1, WISE Program products by companies such as MainSoft and Bristol help management information systems ("MIS") managers reduce costs for software development, maintenance, and training. For developers, the WISE Program provided the opportunity to access technologies in UNIX, Windows, and Macintosh platforms while writing to a consistent set of Windows APIs. *See generally id.* at 6–9.

For Microsoft, the WISE Program provided a wide variety of competitive benefits. Microsoft was facing pressure within the software community to develop a public interface for Windows, or "PWI." On April 11, 1994, Microsoft issued an open letter ("Open Letter") from then-Microsoft Director of Systems Marketing and Standards, Bob Kruger, in which letter Microsoft represented to developers and ISVs that the WISE Program would make Windows APIs "universally available" for Intel x86 and UNIX platforms and "ensure" that customers of Microsoft and its WISE Program partners can use the Windows 32 technologies in their operating systems and application development.

Microsoft was then fending off threats to Windows's status as the dominant operating system for personal computers, while simultaneously attempting to obtain a significant market share in server and workstation technologies. So-called "open code" and "open standards" such as Linux were being developed, and Microsoft pitched the WISE Program as its solution to the call for an "open system." [15] In essence, Microsoft pushed the cross-platforming available under the WISE Program as the sensible alternative to languages such as Java that were being represented as capable of running across UNIX and Windows platforms.

On March 22, 1994, Microsoft issued a press release ("Press Release") touting the benefits of the WISE Program, under which "Microsoft will license source code for the Microsoft® Windows operating system to independent software vendors (ISVs), thus allowing Windows-based applications now to run on all major implementations of the UNIX operating system." According to the Press Release, the WISE Program "agreements, signed with Locus Computing Corporation, MainSoft Corporation and Insignia Solutions, Inc., makes the Windows APIs a universal standard for both the Intel x86 and RISC-based UNIX platforms and help ensure that customers can take advantage of evolving 32–bit Windows technology in both their operating systems and application development." Through the Press Release and the Open Letter, Microsoft sent a targeted message to developers, ISVs, and MIS managers that the WISE Program made Windows in essence an open and universal standard.

According to PX 1, the WISE Program offered three major benefits to MIS managers: "Compatibility, Consistency, and Confidence." WISE products offered Microsoft customers "compatibility" through the ability to use a PC-like environment on Macintosh and UNIX systems, to use shrink-wrapped Windows-based applications on UNIX and Macintosh systems, and to allow developers to write programs to Windows APIs that will run across a variety of platforms. PX 1 at 4. Microsoft maintained that the WISE Program offered MIS managers "consistency" by eliminating the need to purchase non-Windows applications and software to run ex-

---

**15.** An "open standard" describes a programming standard in which everyone that participates agrees to discuss and make any changes publicly. In other words, it is a programming standard over which no one company has proprietary control. Linux is an example of a UNIX-like "open source" operating system, that is continuously updated openly by programmers around the world.

isting and future applications. *Id.* Most important for this discussion, Microsoft promised "confidence" in the continuing benefits of the WISE Program to MIS managers:

> Companies can adopt a solution that will evolve along with *future versions* of the Windows family, taking full advantage of *evolving* 32–bit technology. Microsoft is *committed* to providing WISE licensees with *future versions* of Windows family source code, thereby continuing to maximize application compatibility and performance for today's and *tomorrow's* applications. Customers can be *confident* that their investments today will continue to realize benefits *well into the future.*

*Id.* at 4–5 (emphasis added). The WISE Mission Statement (PX 1) makes no reference to the three-year term of various licensing agreements under the WISE Program.

Microsoft also asserted in PX 1 that WISE benefits MIS managers by "Reducing Client/Server Migration Costs."[16] *Id.* at 5. Suggesting that WISE software will support server operating system needs, Microsoft touted that, "[w]ith WISE, MIS professionals can migrate mainframe software once to Windows and use WISE to run the migrated software on UNIX and Macintosh systems." *Id.* According to PX 1, "MISs can choose the target platforms for migration independent of the issue involved in the software migration," such that "an MIS team without much UNIX system expertise can choose to downsize to UNIX platforms by downsizing software to Windows and using WISE to run the software on the UNIX platforms." *Id.*

From almost the beginning of the WISE Program, then, Microsoft told its current and potential customers that the WISE Program worked and would continue to work because Microsoft had and would provide its WISE Program partners, such as Bristol and MainSoft, with the Windows source code required to allow WISE Program technology to "maximize application compatibility . . . well into the future." *Id.* at 4–5. Microsoft implemented the WISE Program to meet the competitive challenges posed by UNIX-based rivals such as Sun Microsystems Inc., the development and projected capabilities of technologies such as WABI[17] and languages such as Java, and the PWI movement in favor of transforming Windows APIs to open source code languages.

It is important to note that the court is not making any finding that Microsoft acted illegally by creating the WISE Program for its advantage in an attempt to defeat its competitive rivals in the workstation and server operating systems market. Moreover, the court accepts for the most part Kruger's testimony that Microsoft's statements in the Press Release, the Open Letter, and PX 1 were not false nor intended to be false or misleading at the time those documents were issued.[18]

---

**16.** A "client," on a local area network or the Internet, is a computer that accesses shared network resources provided by another computer, called the "server."

**17.** "WABI" stands for *Windows Application Binary Interface.* After Sun Microsystems acquired the company that originally developed WABI, Sun developed the technology and eventually released it as an emulation product or emulator. Emulation involves the use of software to mimic and perform tasks normally performed by hardware or other software. An emulator works by interpreting, "on the fly," instructions written for one type of hardware or software and then generating instructions that will accomplish the same result on a different type of hardware or software. In this context, an emulator allows a Windows-based application to run on UNIX-based and Macintosh platforms.

Sun produced a 16–bit version of WABI which could run 16–bit Windows applications. However, Sun was met with failure in its attempt to produce a version of WABI which would effectively run Win32 applications, from 32–bit Windows operating systems such as Windows 95 and NT 3.

**18.** The court does not accept Kruger's testimony that porting tools for use with servers were not included in the WISE Program from the beginning. Testimony by the Blackwells

Rather, as discussed below, it is the use of deceptive practices in the course of carrying out this business decision that violates CUTPA.

Through the WISE Program, Microsoft conveyed the message that applications written for Windows could be easily made available to UNIX users by translating, or porting, those applications using a WISE product, such as Bristol's Wind/U. This meant that an application developer ("developer"), both within corporations writing applications for internal use and within software companies, who chose to write Windows applications, would be able to take advantage of the emerging Windows server and workstation operating system markets while maintaining its position as an application developer for UNIX systems. In essence, WISE Program software such as Wind/U would provide a "bridge" back to UNIX for ISVs and developers who chose to start writing to Windows APIs but also wanted their applications to run on UNIX and/or Macintosh platforms.

This "bridge" represented a significant savings in time and resources for ISVs and developers that wanted their applications to run on both Windows and other platforms. ISVs and developers face significant costs if they must rewrite an application in another language. Estimates place the savings from simply porting an application to another platform at 80% to 90% of the time required to rewrite the program. Of course, conversely, if an ISV or developer writes an application to Windows APIs but later learns that the cross-platforming software will not port the application to other platforms, the ISV or developer will face the unexpected costs in time and resources of rewriting the application for the other platforms, or will lose that market for its applications.

Microsoft's purpose in entering into the WISE Agreements was clearly to convert UNIX ISVs to writing their applications to Windows NT, and thereby convert UNIX

users to NT. Microsoft understood that ISVs and developers write to the operating system that most of their target customers use. At the time Microsoft developed and launched the WISE Program, NT 3 had a very small share of the operating system market for technical workstations and departmental servers since the introduction of the first versions of Windows NT in July 1993. Microsoft shrewdly played to the follow-the-dominant-platform mentality of ISVs and developers by offering them the opportunity to write to NT as Microsoft forecasted it would soon gain a significantly greater market share (as it had in the PC market) and yet still write for (but not write to) UNIX-based platforms through the "bridge" from Windows to UNIX offered by the WISE Program. The WISE Program basically allowed Microsoft to promise long-term rewards with minimal short-term costs or lost opportunities for writing applications to NT APIs instead of to UNIX APIs. Microsoft's message to corporate management information systems ("MIS") managers was similar. The WISE Program offered them the opportunity to use only the Windows platform for workstations, servers and personal computers without giving up the use of their existing resources on UNIX-based and other platforms.

Overall, Microsoft used the WISE Program as part of an effort to gain converts away from UNIX by offering them all of the APIs the Windows NT operating system offered and would offer, without giving up the use of applications on the then-dominant UNIX operating system. In 1994, this strategy was a rational approach for Microsoft in light of its relative market share and technologies. NT 3 offered few, if any, APIs that UNIX did not provide, and UNIX was a considerably better-selling operating system than the earliest versions of NT.

During the course of 1995 and into 1996, Microsoft continued to promote the WISE

to the contrary, supported by documentary evidence, is more persuasive.

Program through the proliferation of PX 1 on its website, through its inclusion in software shipments such as Visual C + +, and in the MSDN. Through PX 1, Microsoft continuously represented to ISVs and developers that they could rely on the ability to port applications written for Windows APIs to UNIX and Macintosh platforms through the technology developed and sold through the WISE Program. When asked, Microsoft assured its customers that they could count on the WISE Program continuing to provide portability of Windows applications to UNIX and Macintosh. Indeed, Microsoft senior vice-president Jim Allchin, who runs the Windows division at Microsoft, testified that Microsoft would intend for ISVs, developers, and other customers to rely on the assurances in PX 1 as late as April 1999, when PX 1 was still posted on Microsoft's website and being distributed with software and the MSDN. Specifically, Allchin testified that a developer using Visual C + + should have, from Microsoft's point of view, relied on PX 1's assurances that a user of Windows APIs could easily port applications to run on a UNIX platform.

The court finds that the record reflects that Microsoft users did in fact rely on the WISE program to implement cross-platforming in their operating directories and application development. By mid–1998, Bristol's Wind/U customer list alone included approximately 300 companies, while MainSoft had approximately 150 developers using its WISE product, MainWin, by mid–1997. Bristol also had, before its dispute with Microsoft became known, a real-

istic likelihood of substantial sales of its runtime product.

## 2. Microsoft's growing doubts about, and shifting position on, the WISE Program

Amidst this public display of "confidence" and continuous support for the WISE Program, however, doubts surfaced and spread within Microsoft about the wisdom of continuing the WISE program in its full scope, i.e., providing full NT source code to its WISE Program partners and thereby allowing the full portability of all Windows APIs to other platforms. Indeed, as early as May 1996, Microsoft's internal communications reflect CEO and then-President William Gates's concern about "losing the franchise." Gates and others worried that, by providing all of the evolving Windows source code to Microsoft's WISE Program partners, whose software then allows the use of all of Windows applications and functions on UNIX and Macintosh platforms, Microsoft would essentially allow users to continue to operate in non-Windows platforms with the benefit of the Windows APIs. The WISE Program, according to this growing view, would hurt rather than advance Microsoft's goal of converting former and potential UNIX operating system users to use of the Windows NT operating system. One e-mail thread includes this concise summary of the "losing the franchise" concern: "The risk of going cross-platform with our server technology, of course, is that we might undermine the market for NT by providing most of its features on UNIX (and MVS)." [19] Gates and other

---

**19.** This worry focused particularly on the emerging Windows NT 5 technologies, with which Microsoft hoped to capture a large market share in a market where it had traditionally been a small player. Windows NT 5, renamed Windows 2000 in October 1998, represents an enormous investment by Microsoft and a major advance over the previous versions of NT. NT 5 contains hundreds more APIs than the earliest versions of Windows NT and contains many new APIs that were not available in NT 4. As of December 1997, with approximately two more years of devel-

opment, Microsoft estimated that it had already spent $270 million on NT 5. Whereas NT 4 offered some new capabilities that were not available in NT 3 or which UNIX could not match, NT 5 possessed many unique APIs and runtimes that were not available on UNIX. As such, NT 5 represented a flagship operating system for Microsoft and a viable alternative to UNIX.

When discussing these new APIs, the court will, for ease, refer to NT 5, although in that context, the discussion would apply, to a lesser degree, to NT 4.

senior executives at Microsoft thus worried that, if NT 4 and NT 5's unique technologies could be ported to UNIX, potential UNIX converts would never buy the latest versions of the NT operating system because they would, in effect, already have all the same capabilities on UNIX.

However serious the "losing the franchise" concern may have been with regard to NT APIs, in 1996 Microsoft believed it had nothing to fear with regard to NT 4 and NT 5 under its existing WISE Agreements. Microsoft read its agreements with Bristol and MainSoft to entitle these WISE Program partners to Windows 95 and NT 3.x source code only. Indeed, this is the position that Microsoft maintains to this day in its counter-claim litigation pending before this court.[20] By May 1996, executives of Microsoft were aware of the shipments of NT 4 source code it sent, in its hindsight view, "in error," to Bristol and MainSoft, but maintained that they had no rights to this code under their WISE agreements.

At the same time, with the introduction of NT 4, Microsoft recognized that its position in the server market was growing stronger and, with the then-expected release of NT 5 in 1999, would grow even stronger.[21] In fact, Gates publicly acknowledged that NT had passed a "critical stage" in sales by year-end 1995. PX 10. Having done so, the WISE Program as a tool to defeat UNIX was becoming less of a benefit and more of a potential detriment.

As early as February 1996, proposals within Microsoft suggested providing its WISE Program partners with only a subset of NT source code. By June 1996,

discussions within Microsoft had turned to converting Microsoft's position toward the WISE Program from full support to "strategic cross-platform server infrastructure and application needs." PX 713. Under this developing view, Microsoft would support the cross-platforming of Windows NT APIs so long as doing so helped it to enter larger segments of the server market and capture more market share, but would exclude an NT technology from cross-platforming where allowing its use on UNIX platforms would risk losing potential NT operating system purchasers and users to competitors. In practice, this would mean restricting the NT source code that Microsoft provided to its WISE Program partners for development of cross-platforming software tools.

### 3. Gates' UNIX Expo Speech

In the midst of Microsoft's beginning doubts about the continued direction, scope and viability of the WISE Program, NT 4 beta versions were made available, prior to the market release of the NT 4 operating system, to selected ISVs and developers in February 1996. NT 4 went on the market in July 1996. Throughout this period, Microsoft continued to distribute PX 1 unmodified, with all its assurances to ISVs, developers, and MIS managers, through its website, products, and the MSDN. The court finds that this continued distribution constitutes affirmative representations by Microsoft.

Then, on October 9, 1996, Gates gave a keynote address to hundreds of UNIX operating system developers, sellers, and users at the UNIX Expo.[22] Gates began by stating very clearly Microsoft's interest in his audience:

---

20. The court severed the counter-claims from Bristol's claims and recently denied cross-motions for summary judgment on them.

21. As noted earlier, Microsoft NT's share of the market in new operating system units on all servers (including departmental servers and technical workstations) grew from a fraction of 1 percent in 1993 to 4.2% in 1994, almost 20% in 1995, 28% in 1996, up to

almost 44% in 1997. (All figures are year-end).

22. The UNIX Expo, held in New York City, is the biggest UNIX conference for UNIX developers and users in the industry. At trial, Jean Blackwell estimated that as many as 20,000 people attended the 1996 Expo. Trans. at 2564.

And through Windows NT, you can see it throughout the design. In a weak sense, it is a form of UNIX. There are so many of the design decisions that have been influenced by that environment. And that's no accident. I mean, we knew that UNIX operability would be very important and we knew that the largest body of programmers that we'd want to draw on in building Windows NT applications would certainly come from the UNIX base.

PX 10. Gates then described the success of Windows NT, including its server technologies, up to that point:

Windows NT probably about a year age passed that critical stage, and so the sales today are very large even by the standards of, say, Windows 95, which is the best-selling operating system. The sales have more than doubled all UNIX servers combined. Here I'm just talking about the server. It's quite a bit more than Netware 4.X, but even more important is to look at the leading indicator. The leading indicator for an operating system is always what are software developers doing? Are they adopting it as their new platform and are they doing more than just porting their applications to the platform? They're doing the neat work that takes advantage of that platform.

And so we have lots of server applications being moved over.

*Id.* Finally, in line with Microsoft's original goal of converting UNIX users to Windows NT through the WISE Program, Gates then pitched the WISE Program to this key audience:

Now, as we recognize that large UNIX space that's out there, there's a lot of things we've done to make these things fit together. First is this idea of taking a

Windows application and running it on UNIX. And we have three partnerships that fit into this: Wyse [sic] provides the Windows interface source environment, and we work together with them to make sure they've got the *very latest* Windows API technology. Bristol and Mainsoft also provide source and binary compatibility, and again that's a *close relationship* where it's *not just some old version* of Windows, it's the *very latest.*

*Id.* Gates's keynote address was delivered to persuade UNIX-based programmers to feel comfortable writing to Windows APIs by trusting the viability and comprehensive scope of the source code provided to Microsoft's partners in the WISE Program.[23]

Bristol was bolstered by Gates's keynote address and the publicity that accompanied his mention of the WISE Program and Bristol. Bristol found that its customers liked hearing Gates say Bristol had a good product and that Microsoft had a commitment to Bristol and the WISE Program. At the end of 1996, Bristol was experiencing growing revenues through its participation in the WISE Program and expected 1997 to be an even better year.

### 4. Microsoft's decisive change in position on the WISE Program

Within a few months of Gates's keynote address, however, Microsoft had clearly decided to cut back the scope of the WISE Program by deciding to provide Bristol and MainSoft with only limited subsets of the latest NT source code. Gates sent an e-mail to Allchin on February 19, 1997 in which he articulated a shift away from a focus on the WISE Program specifically, and a cross-platforming clone strategy more generally, in Microsoft's competitive

---

**23.** Days later, Allchin continued this approach of selling WISE to programmers and ISVs at large when he sent an e-mail to Microsoft group vice president Paul Maritz recommending that Microsoft deliver publicly "a powerful 'you're safe with our cross-platform tools' message." Less than two weeks later,

on October 21, 1996, Allchin sent an internal e-mail to Maritz and others indicating his general agreement with a proposal to cut back on the scope of the WISE Program's approach to cross-platforming Windows 32 APIs.

battle with Netscape over web browser technology. PX 701. MainSoft's WISE Agreement expired a month later, on March 2, 1997. In May 1997, Neault indicated in an e-mail sent to one of Microsoft's representatives in negotiations with Bristol that he expected that Microsoft might license NT 4.x source code in a new WISE agreement with Bristol but "NT 5 is out of the question."

In July 1997, Microsoft proposed a new WISE Agreement to Bristol that would include limited rights to NT 4.x source code, but not NT 5. In August, however, Microsoft decided to delay any future negotiations of a new WISE agreement with Bristol pending the outcome of internal discussions regarding the future of the WISE program. Bristol's WISE Agreement then expired on September 21, 1997.

By October 1997, Microsoft had decided to restrict the NT 4.x source code provided to MainSoft under a ·new WISE Agreement to a limited subset that would not include much of the server technologies.[24] Allchin sent an e-mail to Gates and Maritz on October 24, 1997, openly acknowledging that Microsoft's strategy toward UNIX and cross-platforming has changed over time and acknowledging that Microsoft was not on a course to facilitate a clone of NT on UNIX and so should not be porting the NT 4 server technologies to UNIX.

The effects of this decision on the ISVs who had come to count on the WISE Program in their decision to begin using and writing to Windows NT was not lost on Microsoft. Gates and other executives at Microsoft had acknowledged to one another at least as early as August 1997 that ISVs who wrote applications to the then-available NT 4 APIs without realizing that the WISE Program software would not port all NT 4.x APIS to UNIX and Macintosh, due to the limited subset of NT 4.x

code provided to Bristol and MainSoft, would be, as Gates less than eloquently put it, "just f* * * * *." PX 674. By the end of October 1997, a review of internal Microsoft communications demonstrates that Microsoft's clear strategy was to use the WISE Program *only* to strategically compete with UNIX and Netscape, without allowing the WISE Program to be used in ways that would encourage ISVs and developers to stay on UNIX. The result of this strategy for Bristol, however, was detrimental to the continued success of its Wind/U products. As at least one Microsoft employee involved in the internal discussion in mid–1996 recognized, Bristol and MainSoft would "face damage to their businesses from customers unwilling to commit to a technology for which [Bristol and MainSoft] do not have a long-term license." PX 310.

### 5. Microsoft's counter-arguments are unpersuasive

Microsoft offers several counter-arguments to resist a finding of reckless or intentional behavior. However, the court finds these arguments unpersuasive.

First, the court rejects Microsoft's argument that the position it adopted in negotiating a new WISE agreement with Bristol in 1997 and 1998 "was a reasonable attempt to continue the WISE Program at the royalty levels Bristol and MainSoft desired." Microsoft's Memo. in Opp. (Docket No. 435) at 11. The court finds that Microsoft did not offer the full NT 4 and NT 5 source code at a higher price.

Through the testimony of Maritz, Neault, and Microsoft business development manager Takeshi Numoto, Microsoft essentially claims that it never intended to withhold *all* of the NT 4 or NT 5 source code from Bristol: it merely expected

---

24. This subset of source code became referred to as the "apple core." This shorthand was meant to illustrate that the technology, including APIs and runtimes, in the NT operating system had expanded with each version. The "apple core" would primarily contain

only those APIs and runtimes that were common to NT 3, NT 4, and NT 5. In practical terms, the apple core represented Microsoft's decision to keep any of the unique technology in its improved NT 4 and NT 5 operating systems from being ported over to UNIX.

Bristol to pay a premium royalty for the entire source code, which Microsoft's witnesses claimed they conveyed to Bristol executives at an April 1998 meeting. The court does not find that Microsoft ever made such an offer. The court views this testimony as an attempt to evade a finding of illegal deception, by suggesting that Microsoft was willing to license all NT source code, albeit at an increased price. The court does not, in short, believe Microsoft's witnesses on this issue.

Rather, the court finds that Microsoft decided in 1997 not to include the NT 4 and NT 5 server technologies with the source code provided under its WISE agreements. Microsoft instead decided only to offer an "apple core" in order to prevent the arbitrage of its NT 4 and NT 5 operating systems onto UNIX. Microsoft maintained this position in negotiating new WISE agreements with MainSoft and then Bristol in 1998 and 1999. The 1998 MainSoft and 1999 Bristol WISE agreements do not state outright that the NT 4 and NT 5 server technologies will not be provided under the agreements, but simply do not include the source code necessary for porting NT 4 and NT 5 server technologies.

Second, the court rejects Microsoft's attempt to impugn Bristol's motive as a "we sue Microsoft for money business plan." *See* Microsoft's Memo. in Opp. (Docket No. 435) at 10–11 n.7. The court does not find that Bristol brought suit as its business plan. Rather, the court finds that Bristol was, in DX 1260 for example, realistically exploring the situation and the consequences of bringing suit. In light of the testimony on it, the court reads this e-mail from Bristol's outside director to Bristol's

key executives as indicating the extreme burdens which litigation against Microsoft would place on its business, such that, after a point, the litigation will inevitably *become* Bristol's "business plan" because Bristol would have little time or money for its business of making computer products. In other words, Bristol's business simply could not be expected to continue with "business as usual" if it was going to engage Microsoft in a courtroom battle. Based on the evidence in the record, the court finds that Bristol was merely considering the consequences of taking on a cash-rich, sophisticated, large corporation in court.

■ Further, Microsoft argues that the jury's finding that it did not engage in an unfair act or practice controls the question before the court on punitive damages. Microsoft argues that the jury's failure to find any of its acts "unfair" somehow prevents an award of punitive damages, despite the fact that the jury did find Microsoft engaged in a deceptive act or practice.[25] *See* Microsoft Memo. In Opp. (Docket No. 435) at 7. Microsoft equates a finding of no unfairness with a finding of no recklessness. The court does not agree.

The jury was charged that, to find an unfair act or practice, they should consider three criteria and that an act could be unlawful "because of the degree to which it meets one of the criteria or because, to a lesser degree, it meets all three." Jury Charge (Docket No. 419) at 67.[26] The jury could have viewed Microsoft's behavior as reckless, for example, but found that the behavior was not "unfair" because Bristol did not provide sufficient evidence to adequately support one or more of the prongs

---

**25.** While CUTPA is entitled "unfair trade practices," encompassed within the Act are unfair or deceptive acts, practices, or methods. 42 C.G.S. § 110b.

**26.** The court described the three criteria, derived from the so-called "cigarette rule," as:
First, whether the conduct, without necessarily having previously been considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise;
Second, whether it is immoral, unethical, oppressive, or unscrupulous; and
Third, whether it causes substantial injury to consumers, competitors, or other businessmen.

of the "cigarette rule." *See Id.* at 63–68; Special Verdict Form (Docket No. 420) at ¶ 35.[27] In short, the jury's failure to find Microsoft's conduct "unfair" under CUTPA does not preclude a finding that its deceptive practice was wilful, reckless, or wanton.

Moreover, contrary to Microsoft's repeated suggestions throughout its briefs, the jury did not find that Bristol was unharmed by Microsoft's deceptive act or practice. Rather, the jury rendered a verdict that "Bristol prove[d] that Microsoft, in its trade or commerce, engaged in a deceptive act or practice" and that "Bristol prove[d] that it suffered an ascertainable loss proximately caused by Microsoft's ... deceptive act or practice." Special Verdict Form (Docket No. 420) at ¶¶ 37, 38. The court had given the jury the following instruction on ascertainable loss:

> If you find that Bristol has proven that Microsoft engaged in unfair competition or deceptive acts or practices in the course of its trade or commerce, then you must determine whether Bristol has proven that it suffered a *measurable injury* as a result of the prohibited conduct. As with the instruction I gave you on Bristol's antitrust claims, injury differs from damages; I will instruct you about damages in a few moments. Injury refers to a harm of the type that

a particular law was designed to prevent. In the case of CUTPA, it means an *ascertainable loss resulting from* the allegedly unlawful conduct. At this point, you should concern yourself only with the existence of a *measurable loss or injury,* but not the measure of damages, if any. A loss is ascertainable if it is *measurable,* even though the precise amount of the loss *may not be known. There is no need for Bristol to prove the actual amount of ascertainable loss to meet this element.* Instead, Bristol must prove that, as a result of an unfair method of competition or a deceptive act or practice, it suffered some sort of deprivation, detriment, or injury that is capable of being discovered, observed, or established.

Jury Charge (Docket No. 419) at 71 (emphasis added).

The jury then answered "$1.00" to the interrogatory asking "what is the total fair dollar amount you determine will compensate Bristol for any and all injury to its business caused by Microsoft?" Special Verdict Form (Docket No. 420) at ¶ 39. The court instructed the jury to award nominal damages of $1 under certain circumstances.[28] The jury's award of nominal damages indicates only that the damages to Bristol's business were not sufficiently quantified by the proof Bristol

27. For example, as to the third criterion, the jury was instructed:
> To justify a finding of 'substantial injury' the alleged injury must satisfy three tests:
> First, it must be substantial;
> Second, it must not be outweighed by any countervailing benefits to consumers or competition that the conduct produces; and
> Third, it must be an injury that could not reasonably have been avoided by the injured parties.
> If you find all three tests are met, then the third of the three CUTPA unfairness criteria is established.

The jury might have found that Bristol produced sufficient evidence to support only one or two of these three tests.

28. "You may not, however, calculate damages based only on speculation or guesswork. You must also remember that you can award Bris-

tol damages only for injuries caused by a violation of the antitrust laws or CUTPA. You may not award damages for injuries or losses caused by other factors. You may find, for example, that you are unable to compute the monetary damages resulting from the wrongful act, except by engaging in speculation or guessing, or you may find that you cannot separate out the amount of the losses caused by the wrongful act from the amount caused by other factors, including perfectly lawful competitive acts and/or business decisions made by Bristol. Or you may find that Bristol failed to provide a reasonable basis on which you can determine an amount of damages. You may decline to award damages under such circumstances, or you may award a nominal amount, say $1."

Jury Charge (Docket No. 419) at 77–78.

offered or were not sufficiently attributable separately to Microsoft to render an award of compensatory damages. Nevertheless, the jury clearly did find that Bristol suffered an ascertainable loss to its business from Microsoft's deceptive act or practice.

## C. Conclusions of Law

### 1. Applicable Law

■ Bristol moves for an award of punitive damages as authorized under CUTPA, Conn. Gen.Stat. § 42–110g(a). CUTPA is, by the Connecticut legislature's design, a broadly remedial statute. *Web Press Servs. Corp. v. New London Motors, Inc.,* 203 Conn. 342, 354, 525 A.2d 57 (1987). CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b(a). The Connecticut Supreme Court has observed that the Connecticut "General Assembly, in adopting the sweeping language of § 5(a)(1) of the [Federal Trade Commission Act ('FTCA')], 'deliberately chose not to define the scope of unfair or deceptive acts proscribed by CUTPA so that courts might develop a body of law responsive to the marketplace practices that actually generate such complaints.'" *Associated Inv. Co. Ltd. P'ship v. Williams Assocs. IV,* 230 Conn. 148, 157, 645 A.2d 505 (1994) (citation omitted). "'Predictably, [therefore,] CUTPA has come to embrace a much broader range of business conduct than does the common law tort action.'" *Id.* at 157–58, 645 A.2d 505 (citation omitted). "Moreover, '[b]ecause CUTPA is a self-avowed 'remedial' measure, Conn. Gen.Stat. § 42–110b(d), it is construed liberally in an effort to effectuate its public policy goals.'" *Id.* at 158, 645 A.2d 505 (citation omitted).

■ Accordingly, the Connecticut Supreme Court has held that "there is 'no ... unfair method of competition, or unfair [or] deceptive act or practice that cannot be reached [under CUTPA],'" such that there is a "unique breadth and flexibility of the cause of action created by CUTPA." *Id.* at 158, 159, 645 A.2d 505 (citation omitted). "In enacting CUTPA, the legislature intended to create an expansive act which would provide relief to persons suffering 'any ascertainable loss' as a result of an unfair or deceptive trade practice." *Web Press,* 203 Conn. at 354, 525 A.2d 57 (citation omitted).[29]

CUTPA provides a private cause of action for compensatory damages. Under CUTPA, "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42–110b, may bring an action ... to recover actual damages." Conn. Gen.Stat. § 42–110g(a). "In addition, if a court determines that a practice is unfair or deceptive under CUTPA, it 'may, in its discretion, order, in addition to damages or in lieu of damages, injunctive or other equitable relief.'" *Associated,* 230 Conn. at 160, 645 A.2d 505 (quoting Conn. Gen.Stat. § 42–110g(d)).

■■ Moreover, "[a] plaintiff who establishes a violation of CUTPA may recover not only actual damages, but in some cases attorney's fees and punitive damages as well." *Web Press,* 203 Conn. at 354, 525 A.2d 57 (citation omitted); Conn. Gen.Stat. § 42–110g(a) ("The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper."); Conn. Gen.Stat. § 42–110g(d) ("In any action brought by a person under this section, the court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney

**29.** Although the jury awarded Bristol only nominal damages of $1, the jury found "ascertainable loss" from "a deceptive act or practice" engaged in by Microsoft. *See* Special Verdict Form (Docket No. 420) at ¶¶ 36, 37.

and not on the amount of recovery."); *see also Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 509, 656 A.2d 1009 (1995); *Hinchliffe v. Am. Motors Corp.,* 184 Conn. 607, 617, 440 A.2d 810 (1981). Contrary to common law practice in Connecticut, a plaintiff may recover punitive damages under CUTPA even if he does not plead or prove compensatory damages. *See Associated,* 230 Conn. at 160–61 & n. 16, 645 A.2d 505; *see also Mead v. Burns,* 199 Conn. 651, 666 n. 8, 509 A.2d 11 (1986).

 It therefore follows that even where a plaintiff has failed to prove any actual damages resulting from a violation of CUTPA, a court "in its discretion may award punitive damages and attorney's fees under the CUTPA." *Tillquist v. Ford Motor Credit Co.,* 714 F.Supp. 607, 617 (D.Conn.1989) (citations omitted); *see also Jacques All Trades Corp. v. Brown,* 42 Conn.App. 124, 131, 679 A.2d 27 (1996). Moreover, a court may also award punitive damages and attorney's fees to a plaintiff who has been awarded only nominal damages resulting from an unfair or deceptive practice under CUTPA. *Rizzo Pool Co. v. Del Grosso,* 232 Conn. 666, 689–90, 657 A.2d 1087 (1995) (Berdon, J., concurring). Thus, "[t]he award of nominal damages under CUTPA opens the door to other important remedies" provided by Conn. Gen.Stat. § 42–110g. *Id.* at 690, 657 A.2d 1087. Given this broadly remedial statutory structure, the Connecticut Supreme Court has observed that "CUTPA creates an essentially equitable cause of action." *Associated,* 230 Conn. at 155, 645 A.2d 505.

 In making a finding on punitive damages, the court is to exercise its discretion. Conn. Gen.Stat. § 42–110g(a); *Gargano v. Heyman,* 203 Conn. 616, 622, 525 A.2d 1343 (1987). The court is mindful that its discretion is not unfettered. A court should not award punitive damages under CUTPA unless the evidence reveals "a reckless indifference to the rights of others, or an intentional and wanton violation of those rights.... In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence." *Gargano,* 203 Conn. at 622, 525 A.2d 1343 (internal quotation marks and citation omitted). The Second Circuit has summarized the standard for awarding punitive damages under CUTPA:

> Under CUTPA, which governs the question of the availability of punitive damages in the present case, see Conn. Gen. Stat. §§ 42–110a and [42–110]b, a plaintiff who has established a violation of CUTPA may recover punitive damages if the court finds that the defendant's conduct was recklessly indifferent, intentional and wanton, malicious, violent, or motivated by evil, *Gargano v. Heyman,* 203 Conn. at 622, 525 A.2d 1343[ ].

*Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1040 (2d Cir.1992).

In practice, the terms "wilful", "wanton," and "reckless" have been (somewhat incoherently) treated as meaning the same thing. *Dubay v. Irish,* 207 Conn. 518, 532–533, 542 A.2d 711 (1988). They all do involve " 'highly unreasonable conduct.' " *Elliott v. City of Waterbury,* 245 Conn. 385, 418, 715 A.2d 27 (1998) (quoting *Dubay,* 207 Conn. at 533, 542 A.2d 711). Thus, the Connecticut Supreme Court has summarized recklessness as:

> "... a state of consciousness with reference to the consequences of one's acts.... It is 'more than negligence, more than gross negligence.' ... The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them." ...

*Dubay,* 207 Conn. at 532, 542 A.2d 711 (citations omitted). " 'Wanton misconduct is reckless misconduct,' " i.e., " 'such conduct as indicates a reckless disregard of the just rights or safety of others or of the

consequences of the action.'" *Id.* (citations omitted).

CUTPA itself "provides no guidance as to a method for determining the amount of a punitive damages award." *Staehle v. Michael's Garage, Inc.,* 35 Conn.App. 455, 463, 646 A.2d 888 (1994). Nevertheless, "several methods have gained acceptance by the courts" in Connecticut. *Id.* By common practice, "courts generally award punitive damages in amounts equal to actual damages or multiples of the actual damages." *Perkins v. Colonial Cemeteries, Inc.,* 53 Conn.App. 646, 649, 734 A.2d 1010 (1999) (citing *Staehle,* 35 Conn.App. at 462–63, 646 A.2d 888). Many courts have followed the lead of the district court in *Bailey Employment Sys. v. Hahn,* 545 F.Supp. 62, 73 (D.Conn.1982), *aff'd,* 723 F.2d 895 (2d Cir.1983), in doubling the amount of actual or compensatory damages.[30] *See, e.g., Barco Auto Leasing Corp. v. House,* 202 Conn. 106, 110 n. 3, 520 A.2d 162 (1987).

This method renders little assistance, however, where a plaintiff has been awarded only nominal damages of one dollar. The court notes that Connecticut courts have implicitly recognized that the "two times actual" standard is inapplicable in such cases by awarding as much as $30,000 and as little as $500 in punitive damages to plaintiffs that received either one dollar or nothing in nominal damages resulting from CUTPA violations.[31]

In the absence of an explicit formula or prescribed method for determining the amount of punitive damages in this case, the court takes as its guiding principle that the purpose of awarding punitive damages under CUTPA is to deter future deceptive or unfair business practices by the defendant and others. *Tingley Sys., Inc. v. Norse Sys., Inc.,* 49 F.3d 93, 96 (2d Cir.1995) (citation omitted). Thus, federal courts in this district have noted that, although "Section 42–110g does not specify how punitive damages are to be measured . . . the award should serve the broad remedial goals of eliminating or discouraging unfair methods of competition and unfair or deceptive acts or practices." *Societa Bario E. Derivati v. Kaystone Chem., Inc.,* No. 5:90–CV–599, 1998 WL 182563, at *10 (D.Conn. Apr.15, 1998) (citations and internal quotation marks omitted) (quoting *Boulevard Assocs. v. Sovereign Hotels, Inc.,* 861 F.Supp. 1132, 1139 (D.Conn.1994)).[32] Similarly, in a well-reasoned decision, a Connecticut trial court has held that a defendant's financial standing is also relevant to a determination of

**30.** Despite the general practice of Connecticut state courts to award an amount equal to or double the amount of compensatory damages awarded a plaintiff under CUTPA, "CUTPA neither sets out any formula for arriving at the amount nor sets a maximum of double or treble damages for the punitive damages awarded to deter future conduct." *Lenz v. CNA Assurance Co.,* 42 Conn.Supp. 514, 515, 630 A.2d 1082 (1993).

**31.** *See Tillquist v. Ford Motor Co.,* 714 F.Supp. 607, 617 (D.Conn.1989) (plaintiff was awarded no compensatory damages and $500 in punitive damages); *Calandro v. Allstate Ins. Co.,* No. CV 0337064S, 1998 WL 811605, at *11 (Conn.Super.Nov.12, 1998) (awarding plaintiff $1 in compensatory and $8,000 in punitive damages); *Costin v. Collins,* No. CV 930370818, 1998 WL 166035, at *6 (Conn.Super.Mar.27, 1998) (awarding plaintiff $1 in compensatory and $2,000 in punitive dam-

ages); *Blue Cross & Blue Shield of Conn., Inc. v. DiMartino,* No. 30 06 42, 1991 WL 127094, at *5–*6 (Conn.Super. July 2, 1991) (awarding Blue Cross & Blue Shield no compensatory damages and $30,000 in punitive damages).

**32.** In *Boulevard Assocs. v. Sovereign Hotels, Inc.,* 861 F.Supp. 1132, 1142 (D.Conn.1994), the court awarded reliance damages of $1.135 million and punitive damages of $300,000. The court had previously ruled that the defendants violated CUTPA. *Boulevard Assocs. v. Sovereign Hotels, Inc.,* 852 F.Supp. 127, 135 (D.Conn.1994). The Second Circuit subsequently reversed the district court's determination that the defendants violated CUTPA. *Boulevard Assocs. v. Sovereign Hotels, Inc.,* 72 F.3d 1029, 1040 (2d Cir. 1995). The Court of Appeals, however, did "not decide whether the district court used the correct measure of damages." *Id.*

the amount of punitive damages to award for a CUTPA violation:

> Where compensatory damages are concerned, the focus of the trier must be on what is necessary to compensate fairly the party who has suffered some legal injury and by such compensation to restore the injured party to the position that party would have been in had the wrong not been committed. Once deterrence rather than compensation becomes the focus of CUTPA punitive damages, however, then the financial standing of the party against whom damages are sought becomes relevant and material.... As with the biblical widow's mite, the financial impact of an event on a party depends on financial circumstances. An amount that might deter a poor widow could seem trifling and leave undeterred a corporate entity with large financial resources. The issue then of the defendant's financial circumstances is relevant and material to the deterrent non-common law punitive damages that the plaintiff would be required to prove under the CUTPA count.

*Lenz v. CNA Assurance Co.*, 42 Conn. Supp. 514, 515, 630 A.2d 1082 (1993) (cited with approval in *Boulevard*, 861 F.Supp. at 1139). Accordingly, the court's review of Connecticut case law and the statute itself reveals that, when faced with a plaintiff who has been awarded only nominal damages under CUTPA, a punitive damage award under CUTPA must serve the goal of deterring future unfair or deceptive trade practices by the defendant and others. *See Bailey*, 545 F.Supp. at 73 ("In addition, since a number of Bailey's mis-leading or deceptive representations were blatantly intentional, and since many of the written communications, including the Bailey brochure, appear to have been used to induce not only Hahn but other prospective franchisees to purchase a Bailey franchise, indicating that the deceptions were long-term practices rather than unique acts practiced only upon Hahn, punitive damages, which hopefully will serve as a deterrent to the kinds of unfair and deceptive acts practiced by Bailey, should be assessed.") (cited with approval in *Tingley*, 49 F.3d at 96, and *Lenz*, 42 Conn.Supp. at 515 n. 2, 630 A.2d 1082); *cf. Champagne v. Raybestos–Manhattan, Inc.*, 212 Conn. 509, 533, 562 A.2d 1100 (1989) ("Moreover, punitive damages generally have the flavor of punishment against a defendant for the quality of his conduct and of deterrence to a defendant or others against such conduct in the future."). A punitive damages award under CUTPA should therefore take account of the financial status and size of the defendant to ensure that the damage award will have the deterrent effect on the defendant and others that it is designed to achieve.

### 2. Seventh Amendment Issue

 As a preliminary matter, the court notes that Bristol did not waive any potential right to punitive damages by failing to request a jury instruction on the issue.[33] As both parties agreed at oral argument, the Seventh Amendment to the United States Constitution guarantees the right to a jury determination of punitive damages.[34] *See Defender Indus., Inc. v. Northwestern Mut. Life Ins. Co.*, 938 F.2d 502, 507 (4th Cir.1991) (en banc) (citing

---

**33.** *See* Bristol's Proposed Jury Instructions (Docket No.472). Microsoft also did not request a charge on punitive damages. *See* Microsoft's Proposed Jury Instructions (Docket No. 329) at 107–116; Proposed Jury Instructions (Docket No. 383); Microsoft's Objections to the Court's Draft Jury Charge (Docket No. 405); Microsoft's Request for Instruction (Docket No. 411); Trans. 7/14/00.

**34.** The court is aware of the Second Circuit's decision in *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93 (2d Cir.1995). There, although the Second Circuit held that "the judge, not the jury, [sets] the CUTPA punitive damages," neither party made the argument that such a framework violates the Seventh Amendment right to jury trial. *Id.* at 96. Thus, the court's holding in *Tingley* does not control in this case, where the constitutional argument has been raised.

*O'Gilvie v. Int'l Playtex, Inc.,* 821 F.2d 1438, 1447–48 (10th Cir.1987); *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1391–92 (7th Cir.1984)). By failing to request a jury charge on punitive damages, however, Bristol did not waive its right to have the issue of punitive damages determined; rather, pursuant to Fed.R.Civ.P. 49(a), it waived only its right to have the issue determined by a jury. Microsoft's reliance on Fed.R.Civ.P. 51 to argue that the court should not enter a finding on punitive damages is unavailing. It is true that, in general, "[n]o party may assign as error the ... failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict."[35] Fed. R.Civ.P. 51. However, the impact of this rule is mitigated when, as here, a special verdict form is used. Rule 49(a) provides in pertinent part that:

> The court shall give to the jury such explanation and instruction concerning the matter [ ] submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court *omits any issue of fact* raised by the pleadings or by the evidence, each party *waives the right to a trial by jury of the issue so omitted* unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand *the court may make a finding;* or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

Fed.R.Civ.P. 49(a) (emphasis added). Because the issue of punitive damages was "omitted" from both the special verdict form and the accompanying instructions, the court may enter its own finding on the issue pursuant to Rule 49(a). *See* Fed. R.Civ.P. 49(a); *Piesco v. Koch,* 12 F.3d 332, 343 (2d Cir.1993); *Therrell v. Georgia*

*Marble Holdings Corp.,* 960 F.2d 1555, 1563 (11th Cir.1992). The court will thus turn to determining whether punitive damages should be awarded in this case for Microsoft's deceptive act or practice in violation of CUTPA.

### 3. Microsoft's conduct in committing a deceptive act or practice in violation of CUTPA rises to the level of reckless and wanton behavior sufficient to award CUTPA punitive damages[36]

██ Consistent with the jury's verdict that Microsoft violated CUTPA through deceptive conduct, the court finds that Microsoft engaged in deceptive conduct that satisfies the standard for awarding punitive damages. Microsoft made deceptive statements regarding the WISE Program, beginning in October 1996 and then in 1997 through at least July 1999. Microsoft did so with reckless and wanton indifference to the harm this deceptive conduct caused Bristol and ISVs who relied upon Microsoft's assurances of its commitment to the continued viability of the WISE Program and to providing full access for WISE contractors to the "latest" version of Windows NT and its APIs.

The court finds that Microsoft led ISVs and developers to believe—and *wanted* them to believe—three key factual predicates: 1) the source code for Windows NT would be available to Microsoft's WISE Program partners into the future; 2) NT server technologies would be included with the source code provided to Microsoft's WISE Program partners; and 3) Microsoft's WISE Program partners had and would have "the very latest" code for each version of Windows NT and its APIs. The court finds that Microsoft clearly intended for Bristol to sell its product on the basis

---

35. It should be noted that Microsoft also did not request a charge on punitive damages or an interrogatory on it in the Special Verdict Form, and it did not object to the charge as given for its failure to address punitive damages.

36. Although part of the "Conclusions of Law," following the legal standard for the award of punitive damages, this sub-section addresses what are factual or mixed fact/law findings.

**82**

of this belief, which belief Microsoft intended to instill in ISVs, developers, and other potential Microsoft customers. While the court accepts that these three factual predicates, extracted from and conveyed through, *inter alia*, the Press Release, the Open Letter, and PX 1, were true in 1994 and 1995, there came a time beginning in 1996 when these three assertions were not true, when Microsoft knew they were no longer true, and yet Microsoft continued to promote these three assertions.

Regarding (1) and (2), evolving over time but by at least the summer of 1997, it was clear that Microsoft would neither continue to provide WISE contractors with all of the latest NT source code nor enter into new WISE contracts that provided all of the code, including the NT 4 and NT 5 server technologies. Nevertheless, Microsoft continued to distribute PX 1, including its discussion of the benefits to MIS managers of the WISE Program for easing the burdens of client/server migration, which would require that the WISE products be able to support the latest server technologies that a corporation is using. *See* PX 1 at 5. Indeed, internal Microsoft communications indicate that Microsoft became concerned when Bristol was close to reaching an agreement on a major deal to license its software for use on server operating systems and suggest that Bristol's impending success in bringing the WISE Program to NT server technologies expedited Microsoft's decision to reduce Bristol's access to NT source code.

Regarding (3), Microsoft firmly believed in May 1996 that, although Bristol had taken delivery of some of the latest NT 4 source code "in error," Bristol and its fellow WISE Program contractors had no rights to NT 4 code under the WISE agreements. At the time, NT 4 was the "very latest" code. Nevertheless, in October 1996, Gates told hundreds of UNIX users and programmers that Microsoft

works with its WISE Program partners, specifically Bristol and MainSoft, "to make sure they've got the very latest Windows API technology" and that Microsoft's relationship with Bristol and MainSoft *under the WISE Agreement* is "a close relationship where it's not just some old version of Windows, it's the very latest." Given the court's findings of fact, given the audience to which he delivered his keynote address, and given Gates's stated intent that UNIX programmers should feel comfortable working in a Windows NT platform because of the WISE Program, Gates's statements were, at least, reckless and wanton.

The court's conclusion is reinforced by the fact that NT 4 beta version was available for distribution to developers and ISVs by February 1996, but, in May 1996, Microsoft took the position, as it continues to do in its counter-claim litigation to this day, that the WISE Program contractors, including Bristol, had no rights to the NT 4 code *under the WISE Agreements* and were not to have been provided the NT 4 code pursuant to those agreements. Further, Microsoft took the position, and continues to maintain, that Bristol could not, under the WISE Agreement, use any NT 4 code it may have received in 1996. Microsoft simply cannot assert from May 1996 to the present internally, to Bristol, and to the court that Bristol has no rights to NT 4 code under the WISE Agreement and then assert—to an auditorium of hundreds of the very programmers and users that Microsoft hoped to convert from UNIX to NT through the WISE Program—that the WISE Program entails the provision of the "very latest" NT code to Microsoft's WISE Program partners. For Microsoft to publicly assert the latter position, with the expectation and intention of reliance by its audience, while simultaneously maintaining the former position in other contexts as it serves Microsoft's various interests, is reckless and wanton.[37] To

---

**37.** Although Microsoft's position on any future WISE contract was quite firmly fixed by

October 1997, certainly by August 25, 1998, Microsoft had entered into the 1998 Mainsoft

engage in such deceptive behavior which would predictably and possibly intentionally result in ISVs, developers, and Bristol relying on these false statements to their eventual economic injury rises to the level of "a reckless indifference to the rights of others" and a "wanton violation of those rights." *See Gargano*, 203 Conn. at 622, 525 A.2d 1343.

Stripped from the veil of Microsoft's protestations that it merely engaged in highly competitive behavior, Microsoft's deceptive statements regarding the viability and scope of the WISE Program are, at their core, like a classic "bait-and-switch" tactic perpetrated on the targeted ISVs, developers, and UNIX users whom Microsoft sought to convert to Windows use and on its WISE Program partner Bristol whom Microsoft coopted into the role of facilitator of this tactic. *See generally* 16 C.F.R. § 238.0 et seq. Microsoft encouraged UNIX developers, as well as ISVs and MIS managers, to switch to Windows because of the ease of portability of Windows applications that the WISE Program afforded. Microsoft publicly and continuously—most notably through the long-standing distribution of PX 1[38]—touted the openness that the WISE Program conveyed to Windows APIs and lauded the up-to-date source code which Microsoft's WISE Program partners Bristol and MainSoft were constantly provided. At the same time, Microsoft was distributing and promoting its "very latest" NT versions, including NT 4 and NT 5 and the enhanced server technologies accompanying these product releases. In short, Microsoft "baited" users of UNIX and Macintosh platforms, ISVs, developers and MIS managers into using Windows for all their computing needs, confident in their ability to rely on the products of Microsoft's WISE Program Partners to port the latest Windows APIs to an existing UNIX or Macintosh platform that a company might continue to use.

Moreover, through Microsoft's continued distribution of PX 1 and very public endorsements and assurances of support such as Gates's keynote address (which mentioned Bristol specifically), Microsoft baited Bristol into continually devoting substantial resources to developing and selling WISE Program software. Bristol incurred enormous costs throughout 1996 and 1997 to continually develop and distribute its WISE products. These costs included not only such costs as production and support and customer services, which are offset by Bristol's approximately $8.4 million in sales of Wind/U products in each of 1996 and 1997, but also the opportunity cost of devoting a significant share of the company's resources to a program that Microsoft was falsely assuring customers would remain viable and up-to-date. Moreover, Bristol continued to spend an average of $2 million a year in 1996 and 1997 in research and development on Wind/U related products, encouraged by the public support Microsoft showed for the WISE Program and the assurances that Microsoft gave customers that they could rely on and be "confident" in the program's "continuity" and "compatibility" with the "very latest" Windows technology.

Then, perhaps as early as 1996 and clearly by some time in 1997, Microsoft "switched" on these converted Microsoft customers as well as Bristol without public warning or notice, indeed, while publically pushing the three "Cs." In an effort to

---

Agreement which, in its coverage of limited technologies, could neither assure "compatability," nor be a basis for "confidence" or "consistency." *See* PX 1. When Microsoft "cut up" the source code in the limited subset covered by the new WISE contract, an ISV could not be confident that all the APIs necessary to port its program's functions were included.

**38.** Since the time the jury returned its verdict finding deception under CUTPA, Microsoft has represented to the court that it has removed PX 1 from its websites. Its stated intention to remove it from future versions of the MSDN library and of Visual C++ is the subject of the court's Ruling on Bristol's Motion for Injunctive Relief, *infra*.

undermine the competitive threat of WABI, UNIX, Java, and later Netscape, Microsoft restricted the access of Bristol and MainSoft to the "very latest" Windows technology. This, in turn, meant that ISVs and developers (as well as the MIS managers who depend on their products) were unknowingly writing programs to Windows APIs (and purchasing Windows software) with the expectation that the WISE Program products would allow the Windows APIs to port them to UNIX and Macintosh platforms. Microsoft vice-president John Ludwig's e-mail to Microsoft development manager Don Bradford aptly portrays the hapless predicament in which such customers would find themselves, in the context of a then-key piece of Windows technology, COR:

> on xplatform [cross-platform] class libs, we had an interesting and at time entertaining discussion. bill [Gates] first asserted that we should be taking the entire COR infrastructure to all platforms. bobmu [Bob Muglia] and I educated him about the expense of doing so—bob was pretty clear that there is no plan to take COR anywhere but windows. bill was initially shocked at this—he even said "so an isv that writes to COR is just f* * * * *." this had us all rolling on the floor at the irony here—bobmu said "we prefer to say that they are taking full advantage of our platform, bill." bill realized what he had said and agreed that most of COR should probably not be ported everywhere. There was not clear conclusion to this discussion but overall I think there was a sense that most of this work would be windows-centric and that we would not be working in general to take it all xplatform. The exception might be some limited doom pieces for large vertical ISVS who need UNIX solutions too.

PX 674. Microsoft was taking advantage of its customers whom it had led to believe could count on using Windows while using WISE Program software to take advantage of multiple platforms.[39] Having invested time, technology, and money into the installation and conversion to a primarily Windows platform and APIs, these ISVs and developers had little choice but to remain with Microsoft's products because of the enormous time and resources required to rewrite their applications software. These developers' UNIX customers would, in turn, have no choice but to turn to NT 4 or NT 5 exclusively if they wished to continue to use these developers' products.

Bristol was harmed by these same Windows users' expectations, as they came to expect full portability to UNIX and Macintosh platforms, in reliance on Microsoft's ceaseless promotion of the unfettered access it provided Bristol to the latest Windows technology. Meanwhile, Microsoft succeeded in using the WISE Program to attain its desired UNIX converts and halt the movement toward an open code.

Microsoft engaged in a practice of wantonly and recklessly misleading Microsoft users as to the full scope and future viability of the WISE Program by continuing to distribute PX 1 to ISVs and developers, through Microsoft's website, the MSDN, and Visual C++, with no modification or caveat. Despite the crucial changes of position and policy by Microsoft with regard to the WISE Program in 1997, which changes undermined the truthfulness of the three critical predicates of the WISE Program, Microsoft continued to behave in a way that was outwardly indistinguishable from its behavior toward ISVs and the general public at the time when those predicates were true. Microsoft also acted in reckless and wanton disregard of the rights of Bristol and UNIX users and programmers at the UNIX Expo when Gates affirmatively asserted that Microsoft pro-

---

**39.** Microsoft suggested at trial that it did not ultimately pursue COR. Whether it did or did not., this e-mail report of the discussion reflects Microsoft executives' attitudes, intentions, and understanding of the consequences of the decision to provide only the "apple core" of NT 5 source code to its WISE Program partners.

vides Bristol and MainSoft with the "very latest" Windows APIs and the "very latest" versions of Windows, under the WISE Program, when in fact Microsoft had affirmatively asserted for eight months that Bristol and MainSoft had no rights to the NT 4 beta code, which was at the time the indisputably "very latest" Windows technology.

### 4. Measure and award of punitive damages

As discussed above, the methods employed by many Connecticut courts to calculate punitive damages under CUTPA—matching, or applying multipliers to, the amount of the compensatory damage award to the plaintiff—provide the court no assistance where the plaintiff has been awarded only nominal damages. The court instead looks to the deterrent purpose of punitive damage awards under CUTPA. *See Tingley,* 49 F.3d at 96; *Societa Bario,* 1998 WL 182563, at *10. In so doing, the court will, inter alia, look to the financial standing of the defendant whose future wrongdoing it seeks by this ruling to deter. Such an inquiry is necessary to craft a punitive damage award that will serve the purpose of deterring future deceptive trade practices by Microsoft and others, because, as one Connecticut trial court has observed, "[a]n amount that might deter a poor widow could seem trifling and leave undeterred a corporate entity with large financial resources." *Lenz,* 42 Conn.Supp. at 515, 630 A.2d 1082.

The court considers most relevant Microsoft's financial data in the period of mid–1995 to mid–1998, which roughly includes the period in which PX 1 and other statements, including Gates's October 1996 keynote address, were distributed. In FY96,[40] Microsoft had total sales amount-

ing to approximately $8.6 billion and after-tax profits of $2.2 billion.[41] In FY98, Microsoft had total revenues close to $15 billion, with profits of $4.5 billion, amounting to a profit margin over 30%. Trans. at 1090–1091, 2308. An International Data Corporation ("IDC") report in evidence indicates that Microsoft had total software market revenues of $9.03 billion and $12.21 billion in calendar years 1996 and 1997 ("CY__"), respectively.

During the course of the first years of the WISE Program, Microsoft's Windows NT worldwide operating system new end-user units rose from 49,000 in CY93 and 452,900 in CY94 to 1.24 million in CY95 and 2.30 million in CY96. This translates to a Windows NT worldwide operating system new unit share that rose from 0.1% in CY93 and 0.8% in CY94 to 1.8% in CY95 and 2.8% in CY96. By the end of calendar year 1997, Windows NT operating system's new unit share had reached 7.7%. Microsoft reports that it sold 34,000 NT (NT 3.1 and NT Advanced Server 3.1) licenses in FY94 (July 1, 1993 through June 30, 1994), but had sold more than 20,000,000 licenses of NT Workstation and 3,000,000 licenses of NT Server as of October 27, 1998.

Considering only the NT server operating systems, apart from the NT workstation operating systems, Microsoft reportedly sold 1.27 million units of NT Server during CY97, up from 733,256 units in CY96. This represented a 67% rise in Microsoft's market share in server operating systems, from 24% in C96 to 36% in CY97. Microsoft's revenues from its NT Server operating systems totaled $796 million in CY96 and $1.902 billion in CY97.[42] An IDC report in evidence indicates that the worldwide value of new license shipments of the NT Server operating system in CY97 to-

**40.** Microsoft's financial statements report data for fiscal years running from July 1 to June 30. Thus, fiscal year 1996 ("FY96") includes financial data from July 1, 1995 to June 30, 1996.

**41.** At trial, Gates confirmed the accuracy of these figures, as reported in a *Business Week* article. Trans. at 466–468.

**42.** The NT Server 4.0 Enterprise Edition retailed for about $4,000, while the more basic NT Server 4.0 sold for approximately $1,000.

taled $1.1 billion, representing a 25.4% share.

Microsoft NT's worldwide workstation new operating system unit share also increased from 0.1% in CY93 and 1.2% in CY94 to 3.2% in CY95, 3% in CY96, and 1.9% in CY97. Microsoft shipped 7.04 million NT Workstation software licenses in CY97, up from 565,000 in CY95. Microsoft reported that sales of NT workstation operating systems tripled between CY96 and CY97. According to an IDC report in evidence, NT's worldwide workstation equipment revenue amounted to $5.86 billion in CY97.[43]

██ Only a significant punitive damage award can even aim to effectively deter future reckless and wanton deceptive behavior by Microsoft and other corporate entities. As courts awarding punitive damages and penalties in other contexts have observed, to have any deterrent effect, a penalty or punitive damage award must be substantial enough that a defendant may not write it off as just a license fee or a "cost of doing business." *United States v. Mun. Auth. of Union Township,* 929 F.Supp. 800, 809 (M.D.Pa.1996) (penalties for violations of the Clean Water Act); *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437, 451 (1980) (punitive damages in a product liability case).

### 5. Due process limitations on punitive damage award

██ This court is mindful, however, that the United States Constitution "imposes a substantive limit on the size of punitive damages awards." *Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, 420, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994) (citations omitted). This is because "[p]unitive damages pose an acute danger of arbitrary deprivation of property." *Id.* at 432,

114 S.Ct. 2331. "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 574, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Still, "[i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." *Id.* at 568, 116 S.Ct. 1589. "Only when an award [of punitive damages] can fairly be categorized as 'grossly excessive' in relation to [the State's legitimate interests in punishment and deterrence] does it enter the zone of arbitrariness that violates [due process]." *Id.* (citing *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 456, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (plurality opinion)). Similarly, in *TXO Prod. Corp. v. Alliance Res. Corp.,* a plurality of the Supreme Court "eschewed an approach that concentrates entirely on the relationship between actual and punitive damages." 509 U.S. at 560, 113 S.Ct. 2766. Rather, the plurality held "[i]t is appropriate to consider the magnitude of the potential harm that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." *Id.*

Following *Gore,* the Second Circuit has held that, "[a]lthough *Gore* examined the excessiveness of punitive damages awarded in a state court, the universal premise of Supreme Court's due process reasoning suggests that the same considerations ap-

---

**43.** During this same period, according to Microsoft's expert at trial, Bristol's total revenues from its Wind/U products amounted to $1.07 million in CY94, $2.55 million in CY95, $5.14 million in CY96, $6.72 million in CY97, and $6.20 million in CY98. At the same time, Bristol's Wind/U related expenses totaled $2.73 million in CY95, $5.01 million in CY96, $7.09 million in CY97, and $7.32 million in CY98. MainSoft, meanwhile, reported total revenues of $2.1 million in FY96 and $3.1 million in FY97. Like Microsoft, MainSoft's financial data is reported on a July 1–to–June 30 fiscal year basis.

ply equally to the review of punitive damages awarded in federal court." *Lee v. Edwards*, 101 F.3d 805, 809 n. 2 (2d Cir. 1996) (citing *Gore*, 517 U.S. at 574, 116 S.Ct. 1589).

■ The Second Circuit has applied these due process principles in holding that a punitive damage award may be found to be excessive "when the amount is 'so high as to shock the judicial conscience and constitute a denial of justice.'" *Id.* at 808 (citations omitted). "In gauging excessiveness, [a court] must keep in mind the purpose of punitive damages: 'to punish the defendant and to deter him and others from similar conduct in the future.'" *Id.* (citation omitted). A court must ensure "that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Id.* (citations and internal quotation marks omitted).

### a. State interest served by CUTPA punitive damages

■ "[T]he federal excessiveness inquiry ... begins with an identification of the state interests that a punitive award is designed to serve." *Gore*, 517 U.S. at 568, 116 S.Ct. 1589. "[T]he purpose of CUTPA punitive damages is deterrence" of deceptive and unfair business practices by the defendant and others. *Tingley*, 49 F.3d at 96 (citation omitted). The Connecticut Supreme Court has observed that "[t]he ability to recover both attorneys' fees; [Conn. Gen.Stat.] § 42–110g(d); and punitive damages; [Conn. Gen.Stat.] § 42–110g(a); enhances the private CUTPA remedy and serves to encourage private CUTPA litigation," where "CUTPA seeks to create a climate in which private litigants help to enforce the ban on unfair or deceptive trade practices or acts." *Hinchliffe*, 184 Conn. at 617, 618, 440 A.2d 810.

### b. Three guideposts for excessiveness inquiry

■ As a second step in the excessiveness inquiry, "the Supreme Court erected

three guideposts that should assist [the court] in the application of [the Second Circuit's] standard, by which [the court may] deem excessive a punitive damage award that 'shocks [its] judicial conscience.'" *Lee*, 101 F.3d at 809 (citation omitted). "These guideposts include: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* (citing *Gore*, 517 U.S. at 574, 116 S.Ct. 1589).

■ (i). *Reprehensibility of Microsoft's conduct.* The first guidepost in the excessiveness inquiry requires the court to assess the amount of the punitive damages awarded against the degree of reprehensibility of Microsoft's deceptive conduct. *See Gore*, 517 U.S. at 574–75, 116 S.Ct. 1589; *Lee*, 101 F.3d at 809. The Second Circuit has identified several "aggravating factors," extracted from the Supreme Court's *Gore* decision, "that are 'associated with particularly reprehensible conduct' and contribute to the sense that 'some wrongs are more blameworthy than others.'" *Lee*, 101 F.3d at 809 (quoting *Gore*, 517 U.S. at 575, 576, 116 S.Ct. 1589); *see also Gore*, 517 U.S. at 580, 116 S.Ct. 1589 (aggravating factors help to identify "egregiously improper conduct" warranting an award of punitive damages). "Aggravating factors include (1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." *Lee*, 101 F.3d at 809 (citing *Gore*, 517 U.S. at 576–77, 116 S.Ct. 1589).

■ In the present case, there is no evidence that Microsoft presented any threat of physical violence. Rather, the harm caused by Microsoft "was purely economic in nature," as was the case in *Gore*.

517 U.S. at 576, 116 S.Ct. 1589. The Supreme Court noted, however, that "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, ... can warrant a substantial penalty." *Id.*[44] Here, Microsoft acted with reckless and wanton disregard for any economic injury to which its bait-and-switch type tactics subjected scores of ISVs, developers, UNIX users, and MIS managers, as well as its WISE Program partner Bristol. Microsoft's deceptive acts constitute affirmative acts of misconduct which were designed to injure those to whom they were directed, and wantonly risked serious injury, albeit of a purely economic nature. As such, the court finds that this first aggravating factor, though not present in entirely the form discussed in *Gore* and *Lee,* does not foreclose a substantial punitive damage award against Microsoft.

Turning to the second aggravating factor enumerated by the Second Circuit in *Lee,* the court recognizes that greater punitive damages may be warranted where, as in the instant case, "a defendant acted with deceit or malice as opposed to acting with mere negligence." *Lee,* 101 F.3d at 809. In *Gore,* the Supreme Court found a large punitive damage award inappropriate where "the record in this case discloses no deliberate false statements, acts of affirmative misconduct, or concealment of evidence or improper motive as were present in *Haslip* and *TXO.*" 517 U.S. at 579, 116 S.Ct. 1589 (citing *TXO,* 509 U.S. at 453, 113 S.Ct. 2711, and *Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 5, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). The *Gore* Court further observed that "the omission of a material fact may be less reprehensible than a deliberate false statement, particularly

when there is a good-faith basis for believing that no duty to disclose exists." *Id.* at 580, 116 S.Ct. 1589.

Here, the court has explicitly found egregiously deceptive behavior by Microsoft. Clearly more than mere negligence is present. Gates's keynote address was an affirmatively false statement and not merely an omission of material fact. Gates promised his UNIX Expo audience that Microsoft provides its WISE Program with the "very latest" Windows technology, when in fact this had not been the case for the preceding eight months, following the release of the NT 4 beta version, and Microsoft was well aware of it. Furthermore, Microsoft continually distributed PX 1 on its website, through the MSDN, and through Visual C++, targeting ISVs, developers, and MIS managers, even as late as the summer of 1999, well after the many statements and assurances in PX 1 had clearly become false.

■ Finally, the court finds that the third aggravating factor is present in this case, supporting a substantial punitive damage award. On the record before the court, Microsoft "has engaged in repeated instances of misconduct." *Lee,* 101 F.3d at 809.[45] The *Gore* Court recognized that "repeated misconduct is more reprehensible than an individual instance of malfeasance." 517 U.S. at 577, 116 S.Ct. 1589 (citation omitted). Thus, the Supreme Court noted that, "[c]ertainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Id.* at 576–77, 116 S.Ct. 1589. Following *Gore,*

44. The Supreme Court also cautioned, however, that "this observation does not convert all acts that cause economic harm into torts that are sufficiently reprehensible to justify a significant sanction in addition to compensatory damages." *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 576, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

45. The court notes that it may consider both the harm to Bristol and to others caused by Microsoft's deceptive act or practice. *See Gore,* 517 U.S. at 581, 116 S.Ct. 1589 ("Moreover, there is no suggestion that Dr. Gore or *any other BMW purchaser* was threatened with any additional potential harm by BMW's nondisclosure policy.") (emphasis added).

the Second Circuit in *Lee* applied this third guidepost in reviewing a punitive damage award imposed against a police officer in an excessive force case where there was "testimony in the trial transcript as to other complaints against [the defendant] charging excessive force." *Lee*, 101 F.3d at 810. The Court of Appeals concluded that "[a] finding of repeated misconduct is supportable" where, "[a]lthough there is no evidence concerning any formal investigation of these complaints, the jury did hear testimony from [the defendant] about them." *Id.* Here, Microsoft continually distributed the false statements in PX 1, without any mitigating statements to counteract the reliance of a developer or ISV on the assurances provided in PX 1 through the Microsoft website or MSDN or Visual C + +. Indeed, Allchin testified at trial that a developer who read PX 1 in his Visual C + + software as late as April 1999 should generally rely upon the statements contained therein. Thus, the court finds that the first *Gore* guidepost supports the conclusion that a substantial punitive damage award against Microsoft is appropriate in this case.

(ii). *Ratio of punitive to compensatory damages.* The second guidepost in the *Gore* excessiveness inquiry requires a court to examine the ratio of punitive damages to compensatory damages awarded in the case.[46] *Id.* at 809; *see also Gore*, 517 U.S. at 575, 116 S.Ct. 1589. However, the usual ratio inquiry is inapplicable where the plaintiff has been awarded only nominal compensatory damages. *Lee*, 101 F.3d at 811; *see also Gore*, 517 U.S. at 582–83, 116 S.Ct. 1589 ("Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine."); *Getty Petroleum Corp. v. Island Transp. Corp.*, 862 F.2d 10, 14 (2d Cir.1988) ("Here the ratio of compensatory damages—which are not nominal—to punitive damages is approximately [1:25], which appellants contend is unreasonably disproportionate. We agree that a punitive damage award in the amount of $1 million on these facts is grossly disproportionate to the proven actual damages [awarded as compensatory damages in the amount of $43,255]."). As in *Lee*, "[b]ecause the compensatory award here was nominal, any appreciable exemplary award would produce a ratio that would appear excessive by this measure." 101 F.3d at 811. The Second Circuit noted that, while "[i]n *Gore*, a 500 to 1 ratio was 'breathtaking,' . . . in a § 1983 case in which the compensatory damages are nominal, a much higher ratio can be contemplated while maintaining normal respiration." *Id.*

Thus, "the use of a multiplier to assess punitive damages is not the best tool here," such that the court "must look to the punitive damage awards in other [CUTPA] cases to find limits and proportions." *Id.* Following the *Lee* court, the court turns to such a comparison, in conjunction with the third guidepost.

▪ (iii). *Comparison of punitive damage award to other penalties autho-*

---

**46.** The Supreme Court has consistently rejected "a categorical approach" to comparing compensatory and punitive damages. *Gore*, 517 U.S. at 582, 116 S.Ct. 1589. Rather, the Supreme Court has stated several times that "[w]e need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness . . . properly enter[s] into the constitutional calculus." *Id.* at 582–83, 116 S.Ct. 1589 (citations and internal quotation marks omitted). "In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis." *Id.* at 583, 116 S.Ct. 1589. "When the ratio is a breathtaking 500 to 1, however, the award must surely 'raise a suspicious judicial eyebrow.'" *Id.* (quoting *TXO*, 509 U.S. at 481, 113 S.Ct. 2711).

*rized by relevant statutes and awarded in other CUTPA cases.* The third and final *Gore* guidepost requires the court to analyze "the difference between this remedy and the civil [and criminal] penalties authorized or imposed in comparable cases." *Id.* at 809; *see also Mathie v. Fries*, 121 F.3d 808, 816 (2d Cir.1997) ("Though *Gore* initially described the third guidepost with reference to 'civil' penalties, . . . its discussion of this guidepost makes clear that the relevant comparison is with both "civil and criminal penalties." (citations omitted)). The rationale for this guidepost lies in the observation that, "[w]hen penalties for comparable misconduct are much slighter than a punitive damages award, it may be said that the tortfeasor lacked 'fair notice' that the wrongful conduct could entail a substantial punitive award." *Lee*, 101 F.3d at 811 (quoting *Gore*, 517 U.S. at 584, 116 S.Ct. 1589). Thus, notice to the defendant of the possibility of its exposure to large penalties is the touchstone of this third guidepost.[47] *See id.* (finding that a substantial punitive damage award was warranted in a 42 U.S.C. § 1983 action against a police officer for assault and battery and malicious prosecution where, "although the criminal and civil penalties for comparable conduct are middling, [the defendant's] training as a police office provided him with some notice of the gravity of his conduct"). However, the *Gore* Court noted that "a reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue.' " 517 U.S. at 583, 116 S.Ct. 1589 (citation omitted). Morever, in determining whether a punitive damage award is excessive, "it is appropriate for [the court] to examine punitive damage awards in similar cases." *Lee*, 101 F.3d at 812. The primary criterion for this secondary analysis is a comparison of the relationship between the amount of punitive damages awarded with the severity of the defendant's acts in this case measured against the severity of the defendant's acts and the amount of punitive damages awarded in other cases. *See id.* ("It is clear that in police misconduct cases sustaining awards of a similar magnitude, the wrongs at issue were far more egregious.").

The court must also be guided by the goal of deterrence that animates the authorization of punitive damages under CUTPA. The Second Circuit has noted that, where punitive damages serve the goal of deterrence, a punitive damage award's deterrent effect "is directly related to what people can afford to pay." *Id.* at 813; *Acciardo v. Millennium Secs. Corp.*, 83 F.Supp.2d 413, 422 (S.D.N.Y. 2000) ("It is true that the financial standing of the defendant should be considered before imposing punitive damages."); *cf. Mathie*, 121 F.3d at 816 ("In making that comparison, we bear in mind that the purpose of punitive awards is to punish the wrongdoer and to deter others."); *Lee*, 101 F.3d at 811 (examining the issue of the defendant's notice of a potentially substantial penalty in light of the defendant's ability to pay: "At the same time, although [the defendant police officer] did have some notice as to the gravity of his conduct, nothing could conceivably have prepared him for a punitive damage award amounting to the sacrifice of the better part of a policeman's after-tax pay for a decade.").

Following the Court's approach in *Gore*, the court first looks to the maximum civil and criminal penalties authorized under CUTPA. The court then looks to the civil and criminal penalties authorized under the FTCA, upon which CUTPA is based, and to other states' similar statutes which are also based on the FTCA. Finally, the

47. The Second Circuit has also held that, "[t]he Supreme Court's guideposts in *Gore*, though marking outer constitutional limits, counsel restraint with respect to the size of punitive awards even as to the nonconstitutional standard of excessiveness." *Mathie v. Fries*, 121 F.3d 808, 817 (2d Cir.1997).

court looks to the punitive damages awarded by other courts under CUTPA.[48] This analysis leads the court to two conclusions: (1) Microsoft was under fair notice that it could face substantial penalties for its deceptive conduct, and (2) there are no cases applying CUTPA which are genuinely comparable or similar to the instant case.

CUTPA, as discussed above, places no limits on the amount of punitive damages that may be awarded for a violation of the statute under Conn. Gen.Stat. § 42–110g(a). *Lenz,* 42 Conn.Supp. at 515, 630 A.2d 1082. However, CUTPA caps the civil penalties which may be assessed for a violation of CUTPA in an action for civil penalties brought by the state Attorney General at $25,000 per violation for a violation of a temporary restraining order or injunction issued under § 42–110d(d) or § 42–110m(a) and at $5,000 per violation if "a person is wilfully using or has willfully used a method, act or practice prohibited by section 42–110b." Conn. Gen.Stat. § 42–110o(a) & (b).[49]

In addition to CUTPA, Microsoft could be exposed to civil and criminal penalties under other unfair and deceptive trade practice statutes for its deceptive conduct. Most prominently, Section (5)(a)(1) of the FTCA, 15 U.S.C. § 45(a)(1), provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."[50] The

FTCA authorizes the Federal Trade Commission ("FTC") to commence civil actions in federal court to seek civil penalties authorized by statute up to a maximum of $10,000 per day against any person violating an FTC regulation "respecting unfair or deceptive acts or practices." 15 U.S.C. § 45(m)(1)(A) & (C).

All fifty states and the District of Columbia have enacted unfair and deceptive trade practices statutes modeled, at least in part, on the FTCA. Jack E. Karns, *State Regulation of Deceptive Trade Practices under "Little FTC Acts": Should Federal Standards Control?,* 94 Dick. L.Rev. 373, 373 (1990). With an eye to the fair notice Microsoft had of potentially substantial penalties, the court looks to the unfair trade practices statutes of states near Microsoft's headquarters in Redmond, Washington, and Bristol's headquarters in Connecticut. In addition to their geographic relevance, these states' statutes provide a fairly representative sampling of the unfair and deceptive trade practices statutes throughout the country. *See generally* Thomas J. Holdych, *Standards for Establishing Deceptive Conduct under State Deceptive Trade Practices Statutes that Impose Punitive Damages,* 73 Or. L.Rev. 235, 235–27 & nn.4–5 (1994); Karns, *supra,* 94 Dick. L.Rev. at 373–75 & nn.2–3.

These so-called Little FTC Acts, like CUTPA, prohibit unfair or deceptive trade practices.[51] Several explicitly provide for

---

**48.** Of course, the court will look only to cases in which courts actually awarded punitive damages under CUTPA. A comparison of the punitive damage award here to CUTPA cases in which the plaintiff was awarded actual or nominal damages but where the court found that punitive damages were not warranted, for whatever reason, would be inapposite for purposes of an inquiry into whether the *amount* of punitive damages awarded is excessive.

**49.** Conn. Gen.Stat. § 42–110o(b) provides that, "[f]or purposes of this subsection, a wilful violation occurs when the party committing the violation knew or should have known that his conduct was a violation of section 42–110b."

**50.** The Connecticut Legislature explicitly relied on the FTCA in enacting CUTPA. *Associated Inv. Co. Ltd. P'ship v. Williams Assocs. IV,* 230 Conn. 148, 156, 645 A.2d 505 (1994). In fact, the express terms of CUTPA dictate that, "in construing [Conn. Gen.Stat. § 42–110b(a)], the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)), as from time to time amended." Conn. Gen.Stat. § 42–110b(b).

**51.** *See* Alaska Stat. § 45.50.471(a) (prohibits "unfair or deceptive acts or practices in the conduct of trade or commerce"); Cal. Civ. Code § 1770(a)(7) (prohibits "unfair or de-

punitive damages without any express limitation on the size of awards under the statute.[52] Some of these states, as in Connecticut under CUTPA, provide that an award of nominal damages will support a punitive damage award.[53] Other Little FTC Acts provide for the award of treble damages, sometimes with a cap.[54] Several of these statutes provide for the imposition of civil penalties for a violation of the statute.[55]

In the instant case, the court notes that an FTC regulation prohibits the deceptive practice of advertising through a "bait-and-switch" method. *See* 16 C.F.R.

§ 238.0 et seq.; *accord* 15 U.S.C. § 45(a). If the FTC brought a civil action against Microsoft for a knowing violation of this rule through its continued distribution of PX 1 for a period of time after the statements therein were no longer true, conservatively estimated at some time in July 1997 and continuing until some time in July 1999, the aggregate penalty for Microsoft's distribution of PX 1 on Microsoft's website and through Visual C++ and the MSDN could reach an amount over $7 million under 15 U.S.C. § 45(m)(1)(A).[56] The court recognizes that this would involve a penalty in the maxi-

---

ceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer," including "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have"); Mass. Gen. L. 93A § 2(a) (prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce"); N.Y. Gen. Bus. L. § 349(a) ("Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful"); Or.Rev.Stat. § 646.608(1)(e) ("A person engages in an unlawful practice when in the course of the person's business, vocation or occupation the person ... [r]epresents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that they do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have"); R.I. Gen. L. § 6–13.1–2 (prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce"); Rev. Wash.Code § 19.86.020 ("unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful").

**52.** *See* Alaska Stat. § 45.50.531(a) & (i); Cal. Civ.Code § 1780(a)(4); Or.Rev.Stat. § 646.638(1); *see generally* Jack E. Karns, *State Regulation of Deceptive Trade Practices under "Little FTC Acts": Should Federal Standards Control?*, 94 Dick. L.Rev. 373, 373 n.3 (1990).

**53.** *See Barber v. Nat'l Bank of Alaska*, 815 P.2d 857, 864 & n. 16 (Alaska 1991); *McLaughlin v. Nat'l Union Fire Ins. Co. of*

*Pittsburgh*, 23 Cal.App.4th 1132, 29 Cal. Rptr.2d 559, 578 (1994); *Sterling Drug, Inc. v. Benatar*, 99 Cal.App.2d 393, 221 P.2d 965, 970–71 (1950).

**54.** *See* Alaska Stat. § 45.50.531(a) (award of the greater of three times the actual damages or $500); Mass. Gen. L. 93A § 11 (double or treble damages to a person engaged in trade or commerce who suffers a loss of money or property from another person's knowing or willful violation); N.Y. Gen. Bus. L. § 349(h) (treble damages up to $1,000 in any action brought by a person injured by a knowing or willful violation of the statute); Rev. Wash. Code § 19.86.090 (treble damages up to a total of $10,000 in civil actions by private persons, including corporations, injured in their businesses by a defendant's violation of the statute).

**55.** *See* N.Y. Gen. Bus. L. § 350–d (civil penalties up to $500 per violation of the statute); R.I. Gen. L. § 6–13.1–8 (civil penalties up to $10,000 for violation of an injunction to restrain a violation of the statute); Rev. Wash. Code § 19.86.140 (civil penalties up to $25,000 for any violation of an injunction issued to restrain a violation of the statute).

**56.** The court recognizes that Microsoft would only face such a penalty if the court were to find that Microsoft had "violate[d] any [FTC] rule under this chapter respecting unfair or deceptive acts or practices ... *with actual knowledge or knowledge fairly implied on the basis of objective circumstances* that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A) (emphasis added). The court finds that, based on the record and the finding discussed above, it can be fairly implied that Microsoft knew its statements in PX 1 were false beginning after mid–1997.

mum amount of $10,000 per day over a period of at least 700 days and that a court imposing a civil penalty under § 45(m)(1)(A) is statutorily required to "take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." 15 U.S.C. § 45(m)(1)(C). Nevertheless, the possibility of such a penalty which could be imposed by a national regulatory agency, coupled with the punitive damages and civil penalties authorized by several states' Little FTC Acts, suffices to demonstrate that Microsoft was on notice that it could face substantial penalties for its deceptive behavior.

This conclusion does not end the analysis, however. The Second Circuit requires the court "to examine punitive damage awards in similar cases." *Lee,* 101 F.3d at 812. A review of the punitive damage awards in CUTPA cases before state and federal courts reveals that the awards range from $250 to $450,000. *Compare Zelazny v. Sanseverino,* No. CVNH9302–5655, 1993 WL 394177, at *3 (Conn.Super. Aug.31, 1993) (awarding $250), *with Scribner v. AIU Ins. Co.,* No. 527659, 1997 WL 793513, at *1 (Conn.Super.Dec.18, 1997) (awarding $450,000); *see also S & S Tobacco & Candy Co., Inc. v. Stop & Shop Cos., Inc.,* 815 F.Supp. 65, 66 (D.Conn. 1992) (collecting federal court decisions awarding punitive damages under CUTPA). The *Scribner* court imposed an award of punitive damages equal to the total compensatory damages awarded to a plaintiff who sued his insurance company for bad faith and infliction of emotional distress arising from arbitration hearings entered into between the company and the plaintiff, which the plaintiff alleged severely aggravated a preexisting condition resulting from an earlier head injury. *See Scribner,* 1997 WL 793515, at *1–*3. Rounding out the high end of CUTPA punitive damage awards, Connecticut trial courts have awarded $60,000 in punitive damages to an attorney-executor for a CUTPA violation arising from an insur-

ance company's conduct during a dispute over the insured's change of the beneficiary in a life insurance policy, *Engelman v. Conn. Gen. Life Ins. Co.,* 1997 WL 524173, at *9 (Conn.Super.Aug.12, 1997), and $50,000 to an engineering firm for a former partner's violation of CUTPA through secret self-dealing, *Vigneau v. Storch Eng'rs,* No. CV 890700122S, 1995 WL 767984, at *10 (Conn.Super.Dec.4, 1995). A jury has also awarded over $137,000 to a plaintiff tools dealer in his suit against the tools manufacturer with whom he had contracted for a dealership for a CUTPA violation arising from the manufacturer's misrepresentations to the plaintiff in setting up and operating the dealership. *Meyers v. Cornwell Quality Tools, Inc.,* No. CV 90 46316 S, 1994 WL 563525, at *1 (Conn.Super.Oct.6, 1994), *aff'd,* 41 Conn.App. 19, 674 A.2d 444 (1996).

Additionally, the court notes that the Second Circuit has affirmed a district court's reduction of a CUTPA punitive damage award from $1 million to $20,000 to a computer hardware and software vendor that won a jury verdict for interference with a business relationship under CUTPA. *Tingley,* 49 F.3d at 95–97. The Second Circuit has also affirmed a district court's award of approximately $27,000 in punitive damages under CUTPA to a counter-claimant franchise purchaser in a suit for fraud and misrepresentation. *Bailey Employment Sys. v. Hahn,* 723 F.2d 895 (2d Cir.1983), *aff'g* 545 F.Supp. 62 (D.Conn.1982). A Connecticut trial court, in *Blue Cross & Blue Shield of Conn., Inc. v. DiMartino,* awarded plaintiff Blue Cross almost $30,000 in punitive damages under CUTPA in a suit against former employee for theft and misuse of confidential and proprietary information. No. 30 06 42, 1991 WL 127094, at *5 (Conn.Super. July 2, 1991).

Having examined the punitive damages awarded in CUTPA cases, the court concludes that there are no cases in which courts have awarded punitive damages un-

der CUTPA that are truly similar or comparable to the instant case. In each of the cases discussed above, the CUTPA violation involved primarily or entirely an injury to only the plaintiffs involved. Moreover, excepting a few insurance companies and franchisors, the defendants involved were small businesses or even individuals. Such facts dictate relatively small awards of punitive damages, for larger awards are not necessary for deterrence purposes and would, at all events, often exceed the defendants' capacity to pay. *Cf. Jiminez v. Going Forward, Inc.,* 25 F.Supp.2d 54, 55 n. 1 (D.Conn.1998) (noting that punitive damage awards under CUTPA "are ordinarily minor amounts").

Here, the court is confronted with an exceptional CUTPA case. Unlike the vast majority of cases decided under CUTPA, the defendant's conduct here was intended to cause a large number of actors in the relevant market to change their behavior. Hundred of millions, if not billions, of dollars of commerce were at stake. Microsoft's deceptive behavior is therefore distinguishable from the violations by most CUTPA defendants, which target only the individual plaintiff or plaintiffs, as is the case even in such relatively high-dollar cases as *Scribner, Meyers, Engelman,* and *DiMartino.* Microsoft's behavior was recklessly deceptive toward an entire class of UNIX users and programmers beginning as early as October 1996 and certainly no later than August 1998, when it signed a new WISE Agreement with MainSoft. Moreover, mindful of the deterrent purpose of punitive damage awards under CUTPA, the court's research simply has not located any other decisions awarding punitive damages for violations of CUTPA by a defendant with cash reserves near $17 billion as of the eve of trial in this case and after-tax profits of, *e.g.,* over $2 billion in 1996, the year of Gates's keynote address at the UNIX Expo.

Furthermore, the court does not read *Gore* or *Lee* to mandate that courts may never more award punitive damages in excess of the highest amount awarded in unfair and deceptive trade practice cases as of the date of those decisions. *Gore* and *Lee* simply cannot reasonably be read to absolutely preclude extraordinary punitive damage awards in extraordinary cases and circumstances. The court is presented here with unusually far-reaching deceptive conduct by an extraordinarily wealth defendant, particularly in comparison to prior CUTPA decisions awarding punitive damages.

### 6. The court awards $1,000,000 under CUTPA to Bristol in punitive damages against Microsoft

From January 1995 through the spring of 1999, Microsoft declared to the world, and most importantly its target customers and ISVs, that its WISE Program partners were given access to the latest Windows technologies, providing a source of confidence, consistency and compatability. Microsoft did so through Gates's October 1996 keynote speech and through the continual distribution of PX 1 on Microsoft's website and through the MSDN and Visual C++. In October 1996 Gates's speech was not true. Beginning sometime in mid–1997, if not earlier, and continuing as late as the trial in the summer of 1999, critical statements in PX 1 were no longer true. The court finds that Microsoft engaged in reckless and wanton behavior by continuing to proliferate these deceptive statements. Furthermore, Microsoft contractually prohibited MainSoft (and later Bristol) from informing any one of the limited technologies Microsoft was providing under the 1998 MainSoft Agreement at the same time Microsoft continued to portray to MainSoft and Bristol's current and potential customers that the WISE Program provided "Compatibility, Consistency, and Confidence."

The court believes than a punitive damage award of $1,000,000 serves the purpose of deterring Microsoft and others from ongoing and future deceptive conduct of the sort the court finds Microsoft commit-

ted here. The court recognizes that, for a defendant with the size and economic power of Microsoft, this award is probably not sufficient, in and of itself, to fully deter it from future deceptive conduct. However, in making this award, the court is, as it must be, constrained by the constitutional concerns of fair notice to defendants of substantial penalties and the danger of arbitrary deprivation of property through excessive punitive damage awards.[56] On balance, it is the court's judgment that this award is sufficiently large to deter similarly egregious deceptive conduct by Microsoft and other similarly situated actors in the future without violating constitutional limits. The court finds that the punitive damage award of $1,000,000 against Microsoft in this case is not excessive and will serve the deterrent purpose of CUTPA.

## IV. MOTION FOR INJUNCTIVE RELIEF

In the second of its two post-verdict motions, Bristol seeks entry of a permanent injunction "to prohibit and correct [Microsoft's] deceptive practices with respect to the WISE program." Bristol Technology's Motion for Permanent Injunction (Docket No. 431) at 1. The court may award "injunctive or other equitable

relief" when a plaintiff prevails on a claim brought under CUTPA. Conn. Gen.Stat. § 42–110g(d). Bristol seeks broad injunctive relief requiring not only curative disclosures by Microsoft regarding the WISE Program, but affirmative, "corrective" advertising about its past and future conduct.

▮▮▮▮ Microsoft opposes the granting of injunctive relief on several grounds and objects to the scope of relief sought as well.[57] Microsoft objects that Bristol has not shown irreparable harm, an essential element Microsoft argues, to the granting of injunctive relief. However, the "irreparable harm" standard that usually governs the decision of whether to award equitable relief is inapplicable in a CUTPA case. *See Lazzaro v. JFS, Inc.,* No. CV 960150751S, 1998 WL 27148, at *1–2 (Conn.Super.Ct. Jan.15, 1998) (citing *Dep't of Transp. v. Pacitti,* 43 Conn.App. 52, 58, 682 A.2d 136 (1996)); *cf. Bauer v. Waste Management of Conn.,* 239 Conn. 515, 532–33, 686 A.2d 481 (1996) (court will grant injunctive relief for a violation of Conn. Gen.Stat. § 8–12 without a showing of irreparable injury or inadequate remedy at law) (quoting *Gelinas v. Town of West Hartford,* 225 Conn. 575, 626 A.2d 259 (1993)).[58] Instead, a plaintiff like Bristol,

---

**56.** The court is fully mindful of the Supreme Court's admonitions against targeting large corporations for substantial punitive damage awards *solely* on the basis of their net worth. *See Gore,* 517 U.S. at 585, 116 S.Ct. 1589 ("The fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of its business. Indeed, its status as an active participant in the national economy implicates the federal interest in preventing individual States from imposing undue burdens on interstate commerce."); *cf. Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 22, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) ("While punitive damages in Alabama may embrace such factors as the heinousness of the civil wrong, its effect upon the victim, the likelihood of its recurrence, and the extent of the defendant's wrongful gain, the factfinder must be guided by more than the defendant's net worth."). As discussed above, however, the court's consideration of Microsoft's

wealth has been limited to concerns for imposing a punitive damage award that will serve the deterrent effect which animates the CUTPA punitive damage award provision.

**57.** Among the grounds for Microsoft's objections is that injunctive relief is unavailable where the jury found that Microsoft did not engage in an unfair act or practice. *See* Microsoft Memo. in Opp. (Docket No. 435) at 21. This argument ignores the plain language of the statute. Microsoft also raised the argument in opposition to Bristol's request for punitive damages, and the court rejects this argument here for the reasons, *inter alia,* discussed earlier in the context of Bristol's punitive damages request. *See supra* Section II.B.5.

**58.** The court finds that, in a diversity case, the standard for the availability of permanent injunctive relief is a substantive and not a procedural matter; as such, Connecticut state law governs. *See* 19 Charles Alan Wright,

having prevailed on a CUTPA claim, may seek injunctive relief without establishing irreparable harm. *See Lazzaro, supra,* at *1–*2. The decision to grant such relief is entrusted to the court's discretion. Conn. Gen.Stat. § 42–110(g)(d).

■ Next, Microsoft argues that Bristol has an adequate remedy at law and thus is not entitled to injunctive relief. The court first notes that none of the cases cited by Microsoft on this point are cases which involve CUTPA. *See* Microsoft's Memo. in Opp. (Docket No. 435) at 21–22. Microsoft's counsel apparently overlooked a Connecticut Supreme Court's decision which held that:

> The fact that a plaintiff fails to prove a particular loss or the extent of the loss does not foreclose the plaintiff from obtaining injunctive relief and attorneys' fees pursuant to CUTPA if the plaintiff is able to prove by a preponderance of the evidence that an unfair trade practice has occurred and a reasonable inference can be drawn by the trier of fact that the unfair trade practice has resulted in a loss to the plaintiff.

*Service Rd. Corp. v. Quinn,* 241 Conn. 630, 644, 698 A.2d 258 (1997). Thus, the fact Bristol sought monetary damages does not preclude it from claiming permanent injunctive relief here, where the jury found a deceptive act and ascertainable loss. The court may exercise its discretion to award equitable relief even where, as here, a jury awards a plaintiff only nominal damages. *See Hinchliffe,* 184 Conn. at 618–19, 440 A.2d 810.

Third, Microsoft argues that any injunctive relief would be moot. Microsoft has represented to the court that it has removed PX 1 from its websites and that it

will remove it from future versions of the MSDN library and its Visual Studio. Thus, Microsoft argues, the need for an injunction has been obviated.

Courts have refused to grant injunctive relief when a defendant has voluntarily terminated the offending practice at issue. *See Knickerbocker Toy Co. v. Azrak–Hamway Int'l, Inc.,* 668 F.2d 699, 703 (2d Cir. 1982); *Pfizer, Inc. v. Miles, Inc.,* 868 F.Supp. 437, 451 (D.Conn.1994). Such cases are distinguishable from the instant one, however. In the *Knickerbocker* case, the defendant had ceased distribution of the complained-of catalogue four days after its initial distribution, and there was no further, similar material distributed by it. 668 F.2d at 703. In the *Pfizer* case, the defendant had entered into a formal agreement with eleven State Attorneys General not to resume the program or any program similar to the one complained of by the plaintiff. In light of this agreement, the court concluded a temporary restraining order was unnecessary.[59]

■ Here, the defendant continued to distribute information about the WISE Program that was deceptive up to and through the trial of this case. Further, while Microsoft removed the WISE Mission Statement ("PX 1") from its websites, it did not voluntarily remove misleading information from other locations containing the same, such as its MSDN library or Visual C++. Further, there is no agreement here enforceable by State Attorneys General that might make injunctive relief unnecessary.

■ As the Supreme Court has noted, the burden to demonstrate mootness is a "heavy one." *United States v. W.T. Grant*

---

Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* Jurisdiction 2d § 4513 at 447–448 n.69 (1996 & 2000 Supp.). The court does cite federal case law as non-binding, persuasive authority on matters not inconsistent with, or not addressed by, Connecticut state court decisions.

59. Microsoft argued that the particular injunctive relief sought by Bristol in its post-verdict motion was not sought in its complaint or pre-trial compliance. However, the Federal Rules authorize the entry of judgment granting the relief to which the party "is entitled, even if the party has not demanded such relief" in its pleadings. Fed.R.Civ.P. 54(c).

*Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). "A litigant must demonstrate that it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *N.Y. State N.O.W. v. Terry*, 159 F.3d 86, 91 (2nd Cir.1998) (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 66, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987)); *see also St. Pierre v. Solnit*, 233 Conn. 398, 402, 658 A.2d 977 (1995) ("Voluntary cessation by a party free to resume the challenged activity, of course, will not automatically shield a claim for an injunction against that very activity from review."); *Water Res. Comm'n v. Conn. Sand & Stone Corp.*, 170 Conn. 27, 34, 364 A.2d 208 (1975) ("A cessation of violations whether before or after institution of suit does not bar issuance of an injunction against further violations if there is a possibility of recurrence."). Microsoft has failed to carry that burden.[60] Thus, the court will consider what injunctive relief is appropriate in this case.

 "It is well-settled that the essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation, ... and to mould each decree to the necessities of the particular case." *Forschner Group v. Arrow Trading Co.*, 124 F.3d 402, 406 (2nd Cir. 1997) (internal citations and quotation marks omitted). "Injunctive relief should be narrowly tailored to address specific harms and not impose unnecessary burdens on lawful activity." *Brooks v. Giuliani*, 84 F.3d 1454, 1467 (2nd Cir.1996) (internal citations and quotation marks omitted). This court must exercise its discretion in framing an injunction that is reasonably designed to prevent wrongful conduct. *Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 355 (2nd Cir.1983). The court should grant injunctive relief only "in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice." *Hammerberg v. Leinert*, 132 Conn. 596, 604, 46 A.2d 420 (1946).

Bristol seeks a permanent injunction that not only prohibits conduct, but also requires "corrective" publication. See Bristol's Motion for Permanent Injunction (Docket No. 431). Bristol argues that, unless Microsoft is ordered to make such disclosures, Bristol's good will is destroyed. Bristol claims that, because of Microsoft's statements in the past to the effect that the WISE Program was a complete "bridge" from Windows to UNIX, Bristol's inability now to be able to support the new, Windows NT 5 APIs will be viewed as its failure to perform, not the result of Microsoft's refusal to license all of its NT 5 source code. Bristol notes that Microsoft asserted, through the trial, that the WISE Program was continuing.[61]

With regard to the scope of any injunction, Microsoft argues that other than one limited to two aspects of PX 1—"future versions" reference and server references—would be unjustified. It argues that the jury was not asked by Bristol to conclude that any other statements were deceptive. Further, Microsoft argues that several aspects of the eleven paragraph proposed injunctive relief would require it to make misleading and incorrect state-

---

60. Further, case law recognizes "continuing effects" of conduct that can be addressed by injunctive relief, even where a defendant ceases the offending conduct. *See Princeton Com. Phone Book, Inc. v. Bate*, 582 F.2d 706, 709–710 (3d Cir.), *cert. den.*, 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978). Here, consumers, having read PX 1 in the past, may continue to comprehend the WISE Program in a way that is no longer true.

61. Bristol also seeks an injunction requiring Microsoft to comply with the terms of the WISE contract it entered into with Bristol post-trial and with Bristol's competitor, Mainsoft in the summer of 1998. Although the Mainsoft contract was in evidence during trial, there is no basis to enjoin a future, speculated breach of a contract that was not sued upon by Bristol and did not even exist pre-verdict. Accordingly, the court will not issue injunctive relief in this regard.

ments about the WISE Program. See Microsoft's Memo. in Opp. (Docket No. 435) at 28–29.

The injunctive relief in this case should be designed to eliminate deception. The court accepts the jury's finding that Microsoft engaged in a deceptive act or practice and finds that it did so some time after the institution of the WISE Program, when it determined not to license all source code for NT 5 and not to license WISE for server use.[62]

The WISE Mission Statement, issued in January 1995, clearly states that using WISE provides companies the benefit of adopting a "solution that will evolve with future versions of the Windows family, taking full advantage of evolving 32–bit technology." PX 1. Microsoft specifically stated it was "committed to providing WISE licensees with future versions of Windows family source code." Although Microsoft argued that "versions" referred to updates only of NT 3 (*e.g.*, NT 3.1, NT 3.2 and so on), the jury could reasonably find this statement deceptive from and after the time Microsoft determined not to give all source code to WISE licensees and not to continue to license server use.

Microsoft defended this case in part on the position that the WISE Program continued. It cited its contract with MainSoft and its outstanding offer to enter into a similar contract with Bristol, which offer was accepted by Bristol post-verdict. Thus, Microsoft describes the WISE Program in a manner which is no longer true, and yet continues to market the Program.

The court will, however, deny Bristol's request for an order requiring corrective advertising by Microsoft. Bristol cites as support for its request decisions regarding orders of the Federal Trade Commission ("FTC"). *See* Bristol Technology's Memorandum in Support of its Motion for Permanent Injunction (Docket No. 432) at 9–

10. The Commissioner of the FTC clearly has the power, pursuant to judicial interpretations of Section 5 of the Federal Trade Commission Act, to order a company to produce corrective advertising. *See, e.g., Warner–Lambert Co. v. FTC,* 562 F.2d 749, 756 (D.C.Cir.1977). Courts in this circuit have also recognized the power of a district court to order corrective advertising to counteract misleading impressions created by the wrongful use of trade names and trademarks or false information disseminated by a company's sales representatives. *See, e.g., E.G.L. Gem Lab Ltd. v. Gem Quality Institute, Inc.,* 90 F.Supp.2d 277, 309–10 (S.D.N.Y.2000); *Zeneca Inc. v. Eli Lilly & Co.,* No. 99 CIV. 1452, 1999 WL 509471, at *42 (S.D.N.Y. July 19, 1999). Courts have denied requests to order. corrective advertising, however, where such injunctive relief would be unnecessarily broad and the deceptive practice can be remedied by more narrowly tailored relief. *See, e.g., Zeneca,* 1999 WL 509471, at *42. The corrective advertising requested by Bristol would be unnecessarily broad to address Microsoft's deception in this case. After hearing all the evidence in the case and reviewing the record, the court finds that Microsoft's practices that form the basis of the CUTPA violation are not the kind of false advertising which would be appropriately remedied by a mandatory injunction requiring corrective advertising. Such an order would be overbroad and insufficiently tailored to the deception sought to be eliminated.

However, injunctive relief is appropriate to prevent continued public deception. Accordingly, the court finds that it is, as part of the judgment in this case, appropriate to include the following order:

1. It is hereby ORDERED that Microsoft, its directors, officers, agents and employees, are enjoined from publishing, distributing or circulating the "WISE Mission

---

**62.** In so finding, the court incorporates its finding of fact in connection with punitive damages issue as if reiterated herein.

Statement" (PX 1), and the portions thereof concerning "Confidence," "Compatability" or "Consistency" in any format (*e.g.*, the MSDN or Visual C+ +), or from making any statement that states, represents or implies: a) that it has licensed under the WISE Program all of the source code of one or more of its current Windows NT or 2000 operating systems; b) that it has licensed use under the WISE Program of its source code to create a cross-platform product for server use; or c) that it intends to do either a) or b) (unless it decides to and takes steps to do so); and, .

2. It is further ORDERED that any description of the WISE Program (whether so-called or renamed) by Microsoft, its directors, officers, agents and employees disclose: a) that the current licenses cover only a limited subset of source code for Windows NT 5 (including as renamed Windows 2000); b) that the current licenses do not include a license for server use; and c) that no assurance can be given that Microsoft will in the future license (i) source code to subsequent operating systems or (ii) future product or version releases of the current operating systems that will support any currently licensed technologies.

This order will expire one year after the expiration or termination of the last WISE licensing agreement, or upon further order of the court.

## V. BRISTOL'S CLAIM FOR ESTOP-PEL

In Count 14 of its Complaint, Bristol asserted a claim for "estoppel." Bristol withdrew Count 14 on the record at the time of the arguments on the summary judgment motions. Bristol agreed that it could be dismissed with prejudice provided it did not preclude Bristol's reliance on the estoppel theory of liability under CUTPA. Microsoft did not object. Accordingly, Count 14, which was not submitted to the jury, is dismissed with prejudice by consent as of May 19, 1999, *nunc pro tunc.*

## VI. ENTRY OF JUDGMENT

Because the court has addressed Bristol's Motion for Injunction as one seeking permanent relief, the court has applied state law, which in these circumstances does not require a finding of irreparable. harm. However, no preliminary injunction can enter in federal court without such a finding. *See SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharmaceuticals, Inc.,* 211 F.3d 21, 24 (2d Cir.2000); *see also* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* Civil 2d § 2948.1 (1995 & Supp.2000). Federal law provides the standard for entering a preliminary injunction even, as here, in a diversity case where the court applies substantive state law in finding the violation at issue. *See Baker's Aid v. Hussmann Foodservice Co.,* 830 F.2d 13, 15 (2d Cir.1987); 11A Wright, Miller & Kane, *supra,* § 2943; 19 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* Jurisdiction 2d § 4513 at 443–444 n.64 (1996 & 2000 Supp.). Therefore, the injunctive relief awarded above will not enter until judgment enters.

The court notes that Microsoft has briefed the entry of final judgment on Bristol's claims under Fed.R.Civ.P. 54(b). A review of the docket and the pending motions before the court, however, reveals that neither Microsoft nor Bristol has a pending Rule 54(b) motion before the court. On July 20, 1999, Microsoft moved for entry of judgment (Docket No. 421) pursuant to Fed.R.Civ.P. 58, and Bristol filed a memorandum in opposition on the same ·day (Docket No. 424). The court denied Docket No. 421 on July 22, 1999, in an endorsement ruling, noting that Microsoft's Fed.R.Civ.P. 58 request for entry of judgment was premature. Thereafter, Microsoft filed a memorandum in support of Docket No. 421 on July 26, 1999 (Docket No. 427) and then briefed a request for entry of a Rule 54(b) judgment in its Au-

gust 16, 1999, memorandum of law in opposition to Bristol's request for punitive damages and a permanent injunction (Docket No. 435). The court has no pending Rule 54(b) motion before it. However, the court will entertain a Rule 54(b) motion. It should be filed no later than September 15, 2000 and an opposition is ordered due by September 30, 2000.

## VII. CONCLUSION

For the foregoing reasons, the court awards punitive damages in the amount of $1,000,000 and grants, in part, Bristol's request for permanent injunctive relief. Count 14 is dismissed with prejudice.

**SO ORDERED.**